IN THE UNITED STATES DISTRICT COURT

OF WESTERN PENNSYLVANIA


MICHAEL A. LAMIA,                CIVIL DIVISION

            Plaintiff,          No. 22-1035

        vs.

THE BOROUGH OF PLUM
trading and doing business
as BOROUGH OF PLUM, PLUM
BORO, PLUM BOROUGH,

            Defendant.


_____

  Transcript of EVIDENTIARY HEARING held MAY 25, 2023
United States District Court, Pittsburgh, Pennsylvania
BEFORE:HONORABLE CHRISTY CRISWELL WIEGAND, DISTRICT JUDGE


<u>APPEARANCES</u>:

For the Plaintiff:          Louis J. Kroeck, IV, Esq.
                            1200 Sarah Street
                            Pittsburgh, PA 15203


For the Defendant:          Jordan P. Shuber, Esq.
                            Dillon, McCandless, King,
                             Coulter & Graham, LLP
                            128 West Cunningham Street
                            Butler, PA 16001


Court Reporter:             Karen M. Earley, RDR-CRR
                            Joseph F. Weis, Jr.
                            U.S. Courthouse
                            6260 U.S. Courthouse
                            700 Grant Street
                            Pittsburgh, PA 15219
                            412-201-2660



Proceedings reported by mechanical stenography.
Transcript produced by computer-aided transcription.

I N D E X

- - -

|                        | DIRECT | CROSS | REDIRECT | RECROSS |
|------------------------|--------|-------|----------|---------|
| PLAINTIFF WITNESS:     |        |       |          |         |
| Michael A. Lamia       | 6      | 30    | 41       | --      |
|                        |        |       |          |         |
| DEFENSE WITNESSES:     |        |       |          |         |
| David Soboslay         | 42     | 67    | --       | --      |
| Harold McCutcheon      | 72     | 91    | 95       | --      |

```
 1                    P R O C E E D I N G S
 2    (May 25, 2023.  In open court.)
 3              THE COURT:  Good afternoon, everyone.
 4              Please be seated.
 5              We're here this afternoon for an evidentiary
 6    hearing in case of Michael Lamia versus Borough of Plum
 7    at Civil Action 22-1035.
 8              Before the Court is plaintiff Michael Lamia's
 9    motion for temporary restraining order and preliminary
10    injunction filed at ECF 19.
11              Counsel, would you please identify yourselves
12    for the record.
13              MR. KROECK:  Your Honor, may it please the
14    Court, Lou Kroeck for plaintiff Mike Lamia.
15              THE COURT:  Good morning, Mr. Kroeck.
16              Is that Mr. Lamia seated next to you?
17              MR. KROECK:  Yes.
18              THE COURT:  Good afternoon to you, sir.
19              And defense counsel.
20              MR. SHUBER:  Good morning, Your Honor.  May it
21    please the Court, Jordan Shuber on behalf of all of the
22    defendants.
23              THE COURT:  Good afternoon.
24              MR. DICE:  Good afternoon, Your Honor.  May it
25    please the Court, attorney Dayne Dice.  I am the
```

1   solicitor for Plum Borough.

2           THE COURT:  Good afternoon to you as well.

3           As background before we begin our hearing,

4   Mr. Lamia filed a motion for temporary restraining order

5   and preliminary injunction on May 19 of 2023.  The

6   motion was referred to me as the duty judge on May 22 of

7   2023.

8           That same day I issued an order indicating

9   that I would not proceed on the temporary restraining

10  order without first hearing from the defendants since it

11  appeared to me that defendants had notice of the case

12  and the motion.

13          I converted the motion into a motion for

14  preliminary injunction and scheduled a status conference

15  with the parties for May 23 of 2023.

16          Both parties attended the status conference on

17  May 23.  I heard argument regarding the motion during

18  that conference and also confirmed with defendants that

19  they would file a written opposition to the motion

20  before noon on May 24 of 2023.

21          At the status conference, both parties stated

22  that they did not believe that an evidentiary hearing

23  would be necessary regarding plaintiff's motion.

24          On May 24 of 2023, however, the defendants

25  filed a document at ECF No. 22 including, among other

1  statements, that plaintiff had misstated both the law

2  and fact and that filing in the Court's view indicated

3  that there may be some factual disputes between the

4  parties that would be necessary for the Court to address

5  that in resolving the motion and that, therefore, I may

6  be required by Third Circuit precedent to hold an

7  evidentiary hearing before I rule on the motion.

8         Shortly after the noon deadline, defendants

9  did file a brief in opposition to plaintiff's motion at

10 ECF No. 23.  However, by that time, the Court had

11 stricken the document at ECF No. 22 and scheduled

12 today's evidentiary hearing to address any necessary

13 factual disputes.

14        I note that defendants did refile a

15 substantially similar brief on the docket this morning

16 by ten a.m.

17        Does either counsel have any necessary

18 corrections or additions to my recitation of the

19 procedural posture regarding the motion?

20        MR. KROECK:  None from plaintiff, Your Honor.

21        THE COURT:  Thank you.

22        MR. SHUBER:  Nothing from the defendants, Your

23 Honor.  Thank you.

24        THE COURT:  All right.

25        Then with that, counsel for plaintiff, are you

 1  ready to call your first witness?

 2           MR. KROECK:  Yes, Your Honor.

 3           THE COURT:  You may proceed.

 4           MR. KROECK:  I'm calling Mike Lamia who will

 5  be my only witness today.

 6           THE COURT:  Sir, you may step up to the

 7  witness box, please.

 8           THE DEPUTY CLERK:  Raise your right hand.

 9           MICHAEL LAMIA, the plaintiff herein,

10  having been duly sworn, testified as follows:

11                    DIRECT EXAMINATION

12  BY MR. KROECK:

13  Q.   Mike, can you state for the Court when you

14  purchased this property?

15  A.   May 7 of 1998.

16  Q.   Who did you purchase it from?

17  A.   His name was James Hurley.

18  Q.   What business was Mr. Hurley involved in?

19  A.   Concrete.

20  Q.   Did you ever apply for a carport on the property?

21  A.   Yes.

22  Q.   When did you do that?

23  A.   2015 or 2016.

24  Q.   Were you approved for the carport?

25  A.   Yes.

**Mike Lamia - Direct**

1  Q.   At that time, did anyone find any problems with

2  your property?

3  A.   No.

4  Q.   Thereafter, did you make any other applications to

5  the Borough?

6  A.   Yes.

7  Q.   For what?

8  A.   I went in approximately a year later to file a

9  permit to put a garage down below on the same lot and

10  Mrs. Oravitz that is not here today is who I spoke to

11  and she said that you already have a garage and I said

12  no.

13        MR. SHUBER:  Your Honor, I object to hearsay

14  testimony.

15  A.   So, I went to apply --

16        THE COURT:  Hold on, sir, please.

17        Opposing counsel, response?

18        MR. KROECK:  I think he is testifying as to

19  what he was told just for the benefit of the Court.  I

20  think he should be allowed to proceed.

21        THE COURT:  I'll allow it.

22  A.   So I went in to go to apply for a permit to put a

23  garage up.  I was told that I already had a garage.  I

24  said no.  I have a carport.  They said, well, that's the

25  same thing.  I said but your paperwork says carport and

1    it says garage, two separate things.  I want a garage.

2            They said, well, you can only have one

3    structure on a property.  I said, well, if I would have

4    known that, I would have just put the garage up.

5            So they sent code enforcement to my house and

6    at that time I had piles of dirt next to my driveway

7    from digging the carport out because I just did it and

8    then I got a letter in the mail about illegally dumping.

9            So I called up.  I talked to them, which was

10   Ms. Oravitz.  She said, you are illegally dumping.  I

11   said, that dirt is from the carport.  She said, it's not

12   all from there.  I said, you weren't here.  It's from

13   the carport.  I said but your paper says just to remove

14   it.  I'm just going to remove it and take it out of

15   here.  It's not a big deal.

16           So I removed it, and that was in May of 2017.

17   I never heard nothing from anybody again.  That paper

18   said third and find notice, so that's when I called and

19   like I was never cited.  I was never fined.  I was never

20   taken to court.

21           Then I went to sell the house in 2021 and I

22   sold it, and Mr. Fields came -- one thing I'll add.  I

23   moved to Florida in July of '21.  So I wasn't even here

24   when the house got sold.  Mr. Fields came and met my

25   real estate agent and said he got a problem with illegal

1  dumping here.

2         And John called me up and I said, there was

3  never illegal dumping.  Never.  It never happened.  He

4  said, well, you're not going to get a permit to rent

5  this house or to sell it.  I said, but I never did

6  anything.

7         So I tried to call and that's kind of what

8  happened.  I called Mr. Fields.  I called Mr. Dave, the

9  assistant manager.  I even sent Dave emails, pictures

10  like this is what this was about and the next thing you

11  know, they transferred it to the hillside.

12         Then Ms. Oravitz said that you're dumping over

13  the hill.  I said, no, I wasn't.  I said, the dirt I

14  removed.  That was four and a half years ago.  Like you

15  never even sent me a letter after this.

16         So from August of '21 until now, I have done

17  nothing but get the runaround of you need to do this,

18  you got this.  This is that.  I'm like, I was never

19  illegally dumping, never.  I have pictures to prove it

20  of what the dirt pile was where it all started from,

21  next to my driveway, four or five dirt piles.  I have

22  the pictures.  They don't even have the pictures.

23  That's where this started from.

24         Then for the past year it went to you were

25  caught illegally dumping over the hill.  I said, no.

1    That hillside has been there since I bought the house in

2    '98.  I never touched the hillside.  They don't have any

3    pictures or anything of me doing so and I have pictures.

4    Q.   Mike, are these the pictures you are referring to

5    for the Court?

6    A.   Yes.

7    Q.   I can enter them as exhibits?

8    A.   Those pictures clearly show the dirt pile is next

9    to my driveway when code enforcement showed up and I got

10   that letter.

11          Like I said, I removed those dirt piles.  It

12   wasn't big.  It was from the carport they give me a

13   permit on.

14          So the carport that they gave me a permit on,

15   Judge, is the same carport that is on the hillside

16   that's in question that they are telling me there is

17   something wrong.

18          MR. KROECK:  May I approach, Your Honor, to

19   hand him these photos?

20          THE COURT:  Yes.

21          MR. SHUBER:  I would just object that not an

22   appropriate foundation was laid for admission of the

23   photos.  I don't know when they were taken.

24          THE COURT:  I haven't heard a motion to admit

25   the photos yet.  I expect one would be forthcoming and

 1  we'll resolve that issue.

 2          MR. SHUBER:  Thank you, Your Honor.

 3  Q.   Mike, did you take these photos.  Are those the

 4  photos you are referring to?

 5  A.   Yes.

 6  Q.   They show the hillside in question, right?

 7  A.   Well, they show next to the driveway at the

 8  hillside, yes.

 9          MR. KROECK:  I move to admit these and

10  Mr. Lamia took them.

11          THE COURT:  Counsel, can you be more specific

12  about how many photos we are looking at and if they are

13  marked for admission.

14  BY MR. KROECK:

15  Q.   The three photos in particular, Mike, you took all

16  three?

17  A.   Yes.

18          MR. KROECK:  I just move to admit them as

19  Exhibit 1.

20          THE COURT:  Any objection?

21          MR. SHUBER:  Yes, Your Honor.  I'm not sure of

22  the timeframe of when the pictures were taken or what

23  electronic device they may have been taken from.  That's

24  the basis of my objection, but I'll defer to the Court.

25          THE COURT:  I don't think that specific

1  information is required but, Counsel, there is some

2  additional foundation you do need to lay regarding

3  whether these are a fair and accurate representation of

4  what is depicted in the photos.

5        MR. KROECK:  Of course, Your Honor.

6  Q.   Mike, when did you take each respective photo?

7  Hold them up as you say.

8  A.   2017 when all this was going on.

9  Q.   Do they represent the condition the property was in

10  in 2017?

11  A.   Yes.

12  Q.   Is it the same condition the property is in today?

13  A.   Yes, minus dirt piles.

14  Q.   Can you point to the photos to which dirt piles you

15  are referring to.

16  A.   Judge, this picture here (indicating), you can

17  barely see a dirt pile in between the two vehicles.

18  This was the hardest one to see.

19        THE COURT:  The witness is describing the

20  photo with the blue car in the foreground and what

21  appears to be a black truck visible on the right middle

22  of the photo, is that correct?

23        THE WITNESS:  Yes.

24  A.   In between them you can see one dirt pile in

25  between.

**Mike Lamia - Direct**

1          MR. SHUBER:  Perhaps we can do it this way,

2    Your Honor.  I'm happy to stipulate with counsel to the

3    admission of these photos to the record if the same

4    courtesy would be returned to my witnesses because I

5    have some photos as well.

6          I would be happy to do that so we don't have

7    to belabor the Court.  I know we have a limited amount

8    of time this afternoon.

9          THE COURT:  Well, we haven't seen your photos

10   yet, but here is what I'm going to do.  I'm going to

11   admit these three photos and counsel, you may carry on.

12         MR. KROECK:  Thank you, Your Honor.

13   Q.   Mike, other than removal of those dirt piles, did

14   you ever do anything to the hillside?

15   A.   No.

16   Q.   Did you ever do anything to change the structure of

17   the hillside?

18   A.   No.

19   Q.   Did you ever dump concrete over the hillside?

20   A.   No.

21   Q.   What business did you say the previous owner was

22   in?

23   A.   Concrete.

24   Q.   Has anyone ever told you the hillside is dangerous?

25   A.   No.

1   Q.   Did you have your own engineer out to inspect the

2   hillside?

3   A.   Yes.

4   Q.   What did he tell you?

5           MR. SHUBER:  Again, renew objection to the

6   hearsay.  I don't think the engineer is here present

7   today to testify.  So that would prejudice my client's

8   ability to cross-examine any testimony that the witness

9   may be about to give.

10          THE COURT:  Response from plaintiff's counsel.

11          MR. KROECK:  We have a signed report from

12  Mr. Lamia's engineer.  He was not available to testified

13  today.

14          Because it is signed and stamped with an

15  engineer's seal, we ask that it be admitted as well.  I

16  was going to move to admit that next.

17          THE COURT:  All right.  But in terms of the

18  hearsay objection?

19          MR. KROECK:  I think the report speaks for

20  itself.  We'll move to enter that.

21          THE COURT:  I'm going to sustain the objection

22  with respect to whatever the statement the witness was

23  about to testify to.

24  Q.   Moving on from that, did anyone at all ever tell

25  you this hillside was unsafe?

**Mike Lamia - Direct**

1  A.    No.

2  Q.    Have you ever seen any unsafe condition on this

3  hillside?

4  A.    No.

5  Q.    Have you ever seen any soil erosion?

6  A.    No.

7  Q.    Have any of your neighbors ever complained to you

8  about the hillside?

9  A.    No.

10 Q.    Were you ever cited?

11 A.    No.

12 Q.    But when you went to sell the property, what

13 happened?

14 A.    The first time Mr. Fields told my agent, told us

15 that we weren't going to get an occupancy permit to sell

16 it or rent it as he has a problem with illegal dumping.

17         I immediately called the Borough and talked to

18 Ms. Oravitz.  She said, again, you need a grading

19 permit.  I said, Heather, we've already discussed that.

20 I removed that dirt a long time ago.  That was four and

21 a half years ago.  She kept saying the same thing.

22 Again, you need to get a grading permit.

23         I just couldn't -- I didn't know what to do.

24 That's where it landed.  So that's kind of what

25 happened.

Mike Lamia - Direct

1   Q.    Throughout the years, you received letters from the

2   Borough, correct?

3   A.    Nothing from '17 until I hired you.

4            MR. KROECK:  I'll move to admit this as

5   Exhibit 2, from the Borough.

6            THE COURT:  Any objection, counsel?

7            MR. SHUBER:  No objection.  Actually, the

8   exhibit binder that I prepared for the Court also

9   included this correspondence as tab 9.

10            THE COURT:  Okay.  Exhibit 2 will be admitted

11   without objection.

12   Q.    Please take your time to look over the letter,

13   Mike.

14   A.    I read this letter 14 times.

15   Q.    Thank you.  Does the letter say anything about the

16   property being dangerous?

17   A.    No.

18   Q.    Does it say anything about a substantial violation?

19   A.    No, it does not.

20   Q.    Does it say anything about a structure on the

21   property being unfit for habitation?

22   A.    It does not.

23            MR. KROECK:  I would move to admit this as

24   No. 3.

25   A.    One thing I would like to add to that, at the

**Mike Lamia - Direct**

1   bottom it says if a grading permit is not obtained, the

2   fill must be removed and that's what I did.

3   Q.   So you complied with the terms of the letter?

4   A.   In 2017, yes.

5   Q.   Exhibit No. 2, is this also a letter you received

6   from the Borough?

7            THE COURT:  Sorry.  Do you mean Exhibit No. 3,

8   counsel?

9            MR. KROECK:  Exhibit No. 3.

10  A.   Yes.

11           THE COURT:  Are you moving to admit this?

12           MR. KROECK:  Yes, Your Honor.

13           THE COURT:  Defense counsel, any objection?

14           MR. SHUBER:  No objection.

15           THE COURT:  Exhibit 3 is admitted without

16  objection.

17  Q.   Same questions, Mike.  Does this say anything about

18  a substantial violation?

19  A.   No, it does not.

20  Q.   And it's your understanding that unless there is a

21  substantial violation, the Borough must issue occupancy

22  for a sale to go through under the state law, is that

23  correct?

24  A.   That's correct.

25  Q.   Does it say anything about the property itself or a

1  structure thereon being unfit?

2  A.   It does not.

3         MR. KROECK:  The next Exhibit is the most

4  recent letter from the Borough of Plum that was

5  discussed at the previous hearing.

6  Q.   Have you seen this letter before, Mike?

7  A.   Yes, I have.

8         MR. SHUBER:  No objection.

9         THE COURT:  All right.  Exhibit 4 will be

10  admitted without objection.

11         MR. KROECK:  Thank you, Your Honor.

12  Q.   Again, same question.  Does it say anything about a

13  substantial violation?

14  A.   It does not.

15  Q.   Does it say anything about a dangerous condition on

16  the property?

17  A.   It does not.

18  Q.   In fact, it just refers to a violation, correct?

19  A.   Yes.

20  Q.   Under the state law, if there is a violation, a

21  temporary occupancy must issue, to your understanding?

22  A.   My understanding is you can still have a

23  substantial violation --

24         THE COURT:  I'm sorry, counsel.  When you say

25  "a violation," where are you referring to in the letter?

**Mike Lamia - Direct**

 1             THE WITNESS:  Right here (indicating), Judge.

 2             THE COURT:  I don't see the words "a

 3    violation."

 4             THE WITNESS:  Do you see where it says 103

 5    McJunkin Road?

 6             THE COURT:  Yes.

 7             THE WITNESS:  Right below that it says,

 8    violation of the property -- an existing violation --

 9             THE COURT:  I see the phrase, "an existing

10    violation."  Is that what you are referring to?

11             MR. KROECK:  Yes, Your Honor.

12    Q.   Mike, to your understanding, occupancy should have

13    issued for the sale to go through?

14    A.   Yes.

15    Q.   And no one ever told you about any dangerous

16    condition?

17    A.   No.

18    Q.   As you stated, you never dumped anything on the

19    property?

20    A.   No.

21    Q.   Did you use Google Earth to show some elevations on

22    the property?

23    A.   I did.

24    Q.   Did you bring photos of that today?

25    A.   Yes.

1          MR. KROECK:  I'm going to move for the Court

2   to take judicial notice of these series of Google Earth

3   photos that will show elevations around the site and

4   that it hasn't changed over the course of the last 10

5   years.

6          THE COURT:  Defense counsel, any objection?

7          MR. SHUBER:  I would just like an opportunity

8   to view the images.

9          THE COURT:  Absolutely.

10          (Pause in the proceedings.)

11          MR. KROECK:  For the Court, Google Earth has

12   often been admitted as evidence in the past.  There's

13   Third Circuit precedent for the use of it.

14   A.   These are all the 12-year difference of the same

15   pinning is what these are.  These are all 12 years

16   difference in the pin.

17   Q.   Is this one complete set?

18   A.   Yes.

19   Q.   Just to be clear, the time stamp I'm looking at in

20   one of the photos is July 2, 2010 and then November

21   2021, is that correct?

22   A.   Yes.

23          MR. SHUBER:  I have no objection to the

24   admission of the photos.

25          THE COURT:  All right.  For clarity of the

**Mike Lamia - Direct**

1  record, how many pages are we talking about and is there

2  a copy for the Court's review?

3          MR. KROECK:  Mike, can you hand the judge her

4  copy.

5          THE WITNESS:  Give me one second, please.

6          (Pause in the proceedings.)

7          THE COURT:  Counsel, will the packet of Google

8  Earth material be marked Exhibit 5?

9          MR. KROECK:  Yes.

10          THE WITNESS:  There is one packet there.

11  Judge, you can see what we are looking at

12  here (indicating).

13          THE COURT:  I want to understand how many

14  pages of material are being offered to the Court for

15  this exhibit.

16          THE WITNESS:  I believe there are 36 pages

17  here.

18          MR. SHUBER:  I'm holding six pages.

19          THE COURT:  Counsel, do you want to get this

20  figured out?

21          MR. KROECK:  Yes.

22          THE COURT:  I don't know what these two

23  are (indicating) so I'm handing them back to you.

24          (Pause in the proceedings.)

25          THE WITNESS:  Here is another set.  I made

 1    three copies of each.

 2              (Pause in the proceedings.)

 3              MR. KROECK:  I apologize.  My client did ask

 4    me should I sort these out.  I said we're starting soon.

 5              THE WITNESS:  I have enough for a full set to

 6    be passed around for sure.  I have a couple singles.

 7    I'm just a little nervous.  That's all.  They are here.

 8    1, 2 and 3 are here.

 9              THE COURT:  Here is what we need to do.  You

10    and your counsel are going to figure ou what you are

11    seeking to admit.  I would like you to provide a set to

12    defense counsel for their review and then we'll

13    determine whether the material will be admitted.

14              MR. KROECK:  We'll get together one full set.

15              THE WITNESS:  I only have the one full set.

16    These are doubles.  I have a full set there and I have

17    one through four here out of six.  That's what I have.

18              MR. KROECK:  Any objection to the admission of

19    the Google Earth images?

20              MR. SHUBER:  How many pages did you have?

21              THE WITNESS:  Well, when I went and printed

22    them there were supposed to be 36.  They gave me the

23    whole thing.  I put them in a tube and I left.  I should

24    have checked them all.

25              MR. SHUBER:  I have 12 pages.

1          THE WITNESS:  Yes.  That's what it should be,

2  12 pages.

3          MR. SHUBER:  Your Honor, I know we are under a

4  time crunch.  I don't have any objections.  They are

5  Google Earth images.  Perhaps the witness' testimony

6  will clarify the differences between the images.

7          THE COURT:  All right.  Exhibit 5, which I

8  understand to be a set of 12 Google Earth images, will

9  be admitted without objection.

10          MR. KROECK:  Thank you, Your Honor.

11  Q.   Mike, can you explain for the Court what the images

12  show?

13  A.   If we start with No. 1, I'm not sure of your

14  name -- I don't remember your name -- I can show you so

15  if we look at Google image No. 1, you see the hand on

16  here (indicating), up here is 2021, down here it shows

17  you longitude, it says 40-2911.39.

18          Then latitude says 79451664.

19          MR. SHUBER:  Mine is already different than

20  yours.

21          THE WITNESS:  Well, this is a different page,

22  that's all.  1121.  This is the one you need

23  (indicating).

24          MR. SHUBER:  If you put them in the exact same

25  order, that will be fine.

Mike Lamia - Direct

1            (Pause in the proceedings.)

2            THE WITNESS:  This is the one I'm showing

3    right here (indicating).  I don't have a full set.  You

4    have the only full set, that's this (indicating).

5            I can show on No. 1 with the hand and

6    longitude and latitude is here (indicating).  Elevation

7    above sea level is 1150 feet and that's right

8    here (indicating).  This is for 1121.

9            When you flip the page and go back 12 years,

10    the same pinning is here with a hand on No. 1.  The

11    longitude and the latitude is exactly the same and so is

12    the sea level, 150 feet above sea level.

13            Each one of these pins have both longitude and

14    latitude here and footage above sea level.  They are 12

15    years apart.

16            THE COURT:  I have no idea what pictures your

17    client is talking about.  I have two pages that both

18    seem from the year 2023.  Is there a question?  Do you

19    want to direct the analysis here?

20            MR. KROECK:  Yes, Your Honor.

21    Q.   Mike, the images in his set, do they show several

22    points on the property?

23    A.   Six.

24    Q.   Do they show that the elevations are identical or

25    substantially similar throughout a 12-year period?

**Mike Lamia - Direct**

1  A.   They are identical, exactly identical.

2         MR. KROECK:  I have nothing further on those

3  exhibits.

4         THE COURT:  Okay.

5         MR. KROECK:  Thank you, Your Honor.  I

6  appreciate your patience.

7  Q.   Mike, when you initially took this matter up on

8  appeal, why did you go to the zoning board instead of to

9  council?

10  A.   Because we were going after occupancy.

11  Q.   You never wanted to appeal this grading issue,

12  right?

13  A.   No.

14  Q.   Because you were never cited?

15  A.   Yes.

16  Q.   The only thing you sought to appeal was denial of

17  occupancy?

18  A.   Yes.

19  Q.   Because you are not aware of any dangerous

20  condition on the property?

21  A.   No.

22         MR. KROECK:  The last thing I would move to

23  admit is this engineering report.

24  Q.   Mike, is this an engineering report you had

25  prepared by a registered engineer?

Mike Lamia - Direct

1   A.   Yes.

2   Q.   Has he been out to actually see the property?

3   A.   Yes.

4            THE COURT:  Counsel, are you moving to admit

5   this document and if so, what exhibit number?

6            MR. KROECK:  I'm just laying a foundation

7   before I do that.

8            THE COURT:  Okay.  But you are going to seek

9   to admit it as Exhibit 6?

10           MR. KROECK:  Yes, Your Honor.

11           THE COURT:  It's a two-page document.  Go

12  ahead and lay your foundation.

13  Q.   How many times did he come out to see the property?

14  A.   Three.

15  Q.   And as you stated, he is a registered engineer?

16  A.   Yes.

17  Q.   And he could not be here today, correct?

18  A.   He could not.

19  Q.   Why not?

20  A.   He has a court hearing at 2:15.

21           MR. KROECK:  I move to admit this as Exhibit

22  6.

23           THE COURT:  Any objection?

24           MR. SHUBER:  Yes, Your Honor.  I don't think

25  the appropriate foundation has been laid to offer this

1  exhibit into the record for the contents of the report.

2  I don't think Mr. Lamia would be qualified to obviously

3  opine to the same results that Mr. Gambone did.

4       If he wants to testify with regard to his

5  knowledge of it and what's been said to him, I think I

6  would also still object.  It would be hearsay.

7       I have a problem with this exhibit coming in

8  because I think the engineer would need to be here to

9  lay the appropriate foundation to offer it into

10  evidence, particularly in this case where one of the

11  issues is the substantial violation.

12       I don't have an opportunity to cross-examine

13  the engineer on this report.

14       THE COURT:  Plaintiff's counsel, response.

15       MR. KROECK:  The only question I intend to ask

16  him is if there was any dangerous condition according to

17  this engineer.  I think that can come in into Mike's

18  knowledge as to whether there is any dangerous condition

19  on the property.

20       THE COURT:  I'm not going to admit this

21  report.  You can ask your question.  If there's an

22  objection to the question, we'll address that but

23  proposed Exhibit 6, the two-page LLG Engineering letter

24  will not be admitted.

25       MR. KROECK:  Thank you, Your Honor.

**Mike Lamia - Direct**

1  Q.   Mike, again, I asked you a few times.  Have you

2  ever been aware of any dangerous condition on the

3  property?

4  A.   No.

5  Q.   It's your understanding if there is no dangerous

6  condition or substantial violation, an occupancy permit

7  must issue?

8  A.   Yes.

9  Q.   How long have you been trying to sell this property

10 for?

11 A.   Two years.

12 Q.   Are you currently paying for the respective

13 purchasers to stay in a hotel?

14 A.   Yes.

15 Q.   How will you be harmed if this sale doesn't go

16 through?

17 A.   If I lose that sale, I'll be back to paying the

18 mortgage like I have for the past 23 months and the

19 bills and the upkeep.  I no longer live in PA.

20         So on that same note about not living in PA,

21 my plane was supposed to go back this morning and I

22 canceled it to stay here for this hearing to go back on

23 Sunday.

24         So I come up here for this even though it was

25 on the phone.  Luckily I did because I was able to be

**Mike Lamia - Direct**

1    here today.

2    Q.   So you have effectively been denied use of this

3    property?

4    A.   Yes, I have.

5    Q.   As stated previously, you never altered the

6    condition of the property as Plum has alleged?

7    A.   Never.

8              MR. KROECK:  I have nothing further.

9              THE WITNESS:  I have one thing I want to add

10   to that, if I can.  Is it okay, Judge?

11             THE COURT:  Counsel, it's your witness.

12   Q.   Absolutely Mike.

13   A.   One thing I wanted to add to what was said on

14   Tuesday.  I did sell the house in 2021 for $207,000.

15   The house has sat empty since then.  We just went in and

16   painted it, new flooring.  So the other counsel asked

17   why it sold for so much more money.  That's why.  I

18   literally fixed everything up inside, resurfaced the

19   cabinets.  That's why it sold for $260,000 this time.

20             MR. KROECK:  Thank you, Mike.

21             THE COURT:  Defense counsel, do you have

22   cross-examination?

23             MR. SHUBER:  Your Honor, before I get to any

24   potential cross, I have been sitting here for the last

25   half-hour and I'm really struggling to find what

1  elements plaintiff got into the record to show that he

2  meets the standard for an injunction.

3           If anything, I think the only testimony that I

4  heard --

5           THE COURT:  Counsel, if you want to make legal

6  argument, we're not going to do that right now.  The

7  question is do you have cross-examination for this

8  witness?

9           MR. SHUBER:  I do.  I have a few questions.

10          THE COURT:  You may proceed.

11          MR. SHUBER:  Thank you, Your Honor.

12          Does the Court have any objection if I use the

13 podium?

14          THE COURT:  I do not.

15                   CROSS-EXAMINATION

16 BY MR. SHUBER:

17 Q.  Good afternoon, Mr. Lamia.  My name is Jordan

18 Shuber.  I represent the Borough defense in this matter.

19 Is it okay if I call you Mike?

20 A.  Yes.

21 Q.  Mike, you testified this afternoon that you

22 purchased the property in 1998, correct?

23 A.  Yes.

24 Q.  You testified that the previous owner was involved

25 in a construction company of sorts, correct?

1  A.   Concrete.

2  Q.   Concrete.  Thank you.

3       If I understood your testimony correctly, you

4  said that this exact fill material that the Borough is

5  asking you to clean up now has been on the property

6  since 1998, is that correct?

7  A.   That and before that.

8  Q.   My question to you is you don't dispute that that

9  debris, concrete, whatever you want to call it, is still

10 on the property, correct?

11 A.   It is still there.

12 Q.   It's still there, that's right?

13 A.   Yes.

14 Q.   And you've never done anything, I think I heard

15 your testimony correctly, to clean up that material

16 that's still on the property, correct?

17 A.   That hillside, yes.

18 Q.   That hillside.  Thank you.

19       I'm going to show you what I will mark as

20 Defendant's Exhibit 1.  A copy of this is at tab 9.  The

21 Court has a copy of the binder.  Mr. Kroeck has a copy

22 of the binder.

23       This contained one of the letters you already

24 admitted into evidence.

25       MR. SHUBER:  Do you have an objection to

**Mike Lamia - Cross**

1  presentation of these letters at tab 9?

2          THE COURT:  Defense counsel, how are you

3  intending to identify this exhibit for the record?

4          MR. SHUBER:  For the record, Your Honor, this

5  will be Defendants's Exhibit A.

6          May I approach the witness?

7          THE COURT:  You may.

8  Q.   I'll make it easier for you.  I'll give you this

9  binder and take this back.  This is tab 9.

10          Mike, have you had a chance to review the

11 letters I handed you at tab 9.

12 A.   Yes.

13 Q.   Is your wife's name Karen?

14 A.   That's my ex-wife.

15 Q.   At the time you received the letter, did you and

16 Karen live at 103 McJunkin Road, Pittsburgh, PA 15239?

17 A.   I just lived there.  She didn't live there.

18 Q.   Let me ask it to you this way.  Do you have any

19 reason to dispute that you received the letters dated

20 May 11, 2017, April 11, 2017, and February 22, 2017?

21 A.   No.

22 Q.   Now, I think I heard your testimony earlier this

23 afternoon to indicate that you did not feel that there

24 was any substantial violations with regard to the

25 material that was on your property, correct?

**Mike Lamia - Cross**

1   A.   Correct.

2   Q.   Are you simply basing that upon your own opinion?

3   A.   I'm basing that on the engineer I had out there

4   three times.

5   Q.   Let me ask it to you this way.  You told me earlier

6   this afternoon that since you've had the property from

7   1998 until now, you never cleaned anything up, correct?

8   A.   No.  I cleaned the dirt piles up that started all

9   this, this whole thing here.  That's what I cleaned up.

10  Q.   Let me ask it to you this way.  You did not clean

11  up the debris on the hillside, correct?

12  A.   The debris, I didn't put the debris on the

13  hillside.

14  Q.   Well, that's not my question.  It has been there

15  since 1998, correct, and you have done nothing to remove

16  it?

17  A.   Nothing.

18  Q.   Would you dispute that the contents of the letter

19  from the Borough of Plum to you referenced the dumping

20  and filling on that hillside?

21  A.   No.

22  Q.   If I could direct your attention to tab 10.

23       MR. SHUBER:  For you, counsel, this is the

24  application for the Zoning Hearing Board.  Let me know

25  if you have any objection.

```
 1            MR. KROECK:  No.  For sake of moving along, I
 2  probably won't object to most of your exhibits.  If I
 3  do, I will.  These seem all aboveboard so far.
 4            MR. SHUBER:  Thank you.
 5            THE COURT:  Counsel, are you going to
 6  be -- how will you identify this document for the
 7  record?
 8            MR. SHUBER:  Yes, Your Honor.  I will identify
 9  this as Defendants Exhibit B.
10  Q.   Mike, let me know when you have had an opportunity
11  to review tab 10.
12  A.   What is the first date of this, April 13, 2022?
13  Q.   That's what the document says, yes.
14  A.   Okay.  I just wanted to be clear on that.
15            (Pause in the proceedings.)
16  A.   Okay.
17  Q.   Would you agree with me that this document in tab
18  10 was your application to the Zoning Hearing Board to
19  appeal the failure to obtain a grading permit?
20            MR. KROECK:  I'm going to object in that the
21  appeal also indicates it's an appeal from an improper
22  denial of an occupancy permit.
23            THE COURT:  Overruled.  The witness may answer
24  the question.
25  A.   When we appealed it, it was to appeal occupancy,
```

1    nothing to do with grading.

2    Q.   So to be clear, it's your testimony that you're

3    disputing the part of the document that says there was a

4    failure to obtain a grading permit?

5    A.   I mean in 2022, five years after '17, we weren't

6    appealing that grading permit.  We were appealing the

7    occupancy.  I never tried to appeal something that I was

8    never cited for or anything.  I was never cited or went

9    to court.  So I can't I appeal something that's not

10   there.  What I could appeal is the denial of occupancy.

11   Q.   Let me ask it to you this way.  Did you file an

12   appeal with the Zoning Hearing Board at Plum Borough?

13   A.   We filed an appeal, yes.

14   Q.   Is this the document that was the basis for the

15   appeal to the Zoning Hearing Board?

16   A.   I mean I don't have a signature on this so I can't

17   say for sure this is what it is.  I just know what it

18   was supposed to be.

19   Q.   Let me ask it to you this way.  Regardless of the

20   document, did you appeal to the Zoning Hearing Board at

21   Plum Borough and have a hearing?

22   A.   Yes.

23   Q.   Would you agree with me that after the hearing,

24   there was findings of fact and conclusions of law?

25   A.   Say that again.

1   Q.    Would you agree with me that after the Zoning

2   Hearing Board there was a determination made with regard

3   to your appeal?

4   A.    There was a determination made at the hearing.

5   Q.    Okay.  So you would agree with me there was a

6   determination made at the hearing that was conducted by

7   the Zoning Hearing Board of Plum Borough, correct?

8   A.    Yes.

9   Q.    You received notice of the determination from the

10  Zoning Hearing Board, correct?

11  A.    I didn't receive notice personally, no.

12  Q.    Let me ask it to you this way.  You were aware that

13  the Zoning Hearing Board denied your appeal, correct?

14  A.    I'm not so much sure they denied it but they told

15  us we should be in front of council.  That is what they

16  told us at the Zoning Board hearing.

17  Q.    So, in essence did they tell you that you filed

18  your appeal in the wrong place?

19  A.    That's what they said.

20  Q.    So you were aware that the Zoning Hearing Board's

21  decision was you shouldn't have filed in front of us,

22  you should have filed in front of the whole council,

23  correct?

24  A.    That's what they said.

25  Q.    That's what they said, correct?

1    A.    Yes.

2    Q.    After that information was conveyed to you, you did

3    not take any further steps within the Borough to appeal

4    that decision, correct?

5    A.    We didn't appeal nothing else.

6    Q.    Thank you.

7    A.    Can I add something to that?

8    Q.    I don't have a question pending, so no.  Thank you.

9          Now, I'm going to describe to you what I'll

10   paraphrase is the first occupancy permit which was filed

11   sometime after this last year, is that fair?

12   A.    Yes.

13   Q.    That first occupancy permit was denied, correct?

14   A.    I'm sorry.  Now we got to back up.  This time last

15   year, that would have been 2022.  There was an initial

16   one before that.

17   Q.    Okay.  Let's talk about the initial one before

18   that.  Was that occupancy permit denied?

19   A.    No.  Do you want me to elaborate on that?

20   Q.    No.  I only have a few more questions for you.  You

21   testified to the Court this afternoon that you have been

22   inconvenienced, among other things, because you live in

23   Florida now, correct?

24   A.    Yes.

25   Q.    So you had to travel back and forth, for example,

**Mike Lamia - Cross**

1  for today's hearing, correct?

2  A.   Yes.

3  Q.   You also testified to the Court that if this

4  injunction is not granted, you won't be able to sell

5  your house, correct?

6  A.   Yes.

7  Q.   Would you agree with me that the occupancy permit

8  you filed before this was denied and you were not able

9  to sell your house then, correct?

10  A.   Yes.

11  Q.   However, you did receive a new offer that's brought

12  us to court today, correct?

13  A.   Yeah.

14  Q.   So is it fair to say that despite that first sale

15  not going through, you've had another offer to buy the

16  house, correct?

17  A.   I thought the offer you were talking about is the

18  offer you were making -- Plum was making, not the offer

19  of the second house.

20  Q.   That's not my question.

21  A.   I misunderstood you.

22  Q.   My question is in the time period between the first

23  occupancy permit being denied and the matter that has

24  brought us to court this afternoon, you have received

25  another offer on the house, correct?

**Mike Lamia - Cross**

1  A.   Yes.

2  Q.   So wouldn't you agree with me that even if this

3  occupancy permit was denied again, there is nothing that

4  would prevent another interested buyer to potentially

5  buy your home, correct, sir?

6  A.   Yes, there will.   The bank will not lend the money

7  with no occupancy.

8  Q.   Well, let me ask you this.   You know and you agree

9  with me that there have been construction debris,

10 stones, a lot of material on the side of that hill, you

11 agree with me, correct?

12 A.   Well, elaborate on "construction debris."

13       MR. KROECK:   I'm going to object.   I don't

14 think he ever testified to construction debris being

15 placed on the hill.

16 Q.   You agreed with me there was debris on the

17 hillside, correct?

18 A.   I agreed with you there is concrete on the

19 hillside.

20 Q.   You have agreed with me that you have not cleaned

21 up that hillside, correct?

22 A.   Yes.

23 Q.   And as you sit here in court, you just told me that

24 it's your opinion the Borough would deny another sale

25 because of the same issue, correct?

**Mike Lamia - Cross**

1    A.    Did I say they would deny another sale?

2    Q.    Is it your opinion that if you don't get this

3    occupancy permit granted, that another occupancy permit

4    would also be likely to be not granted, is that your --

5    A.    Yes.

6    Q.    My simple question to you is knowing this and

7    knowing that all this debris has been on the hillside

8    since 1998, why won't you clean it up?

9    A.    Or before.

10   Q.    Why won't you just clean it up?

11   A.    Because I didn't cause it.  It's been there for

12   years and it's never moved.

13   Q.    But that's not my question.  You agree with me it's

14   your property, correct?

15   A.    It's my property, yes.

16   Q.    Okay.  So this debris exists on your property,

17   correct?

18   A.    Correct.

19   Q.    You have not sued any other party saying that this

20   isn't my stuff, correct?

21   A.    No.

22   Q.    So it's on your property and you won't clean it up,

23   correct?

24   A.    Correct.  Can I ask you a question on that?

25              MR. SHUBER:  Nope.  I don't have any further

**Mike Lamia - Redirect**

1    questions for this witness.

2          THE COURT:  Thank you, counsel.

3          Plaintiff counsel, do you have redirect?

4          MR. KROECK:  Very briefly, Your Honor.

5                REDIRECT EXAMINATION

6    BY MR. KROECK:

7    Q.   Mike, to the best of your knowledge, does Plum

8    council issue occupancy permits?

9    A.   They do not.

10   Q.   It's the zoning board, right?

11   A.   Yes.

12   Q.   And that's who you went in front of?

13   A.   Yes.

14   Q.   Your only goal here was to get an occupancy permit?

15   A.   Yes.

16   Q.   And that's your only goal today?

17   A.   That's my only goal today.

18          MR. KROECK:  Thank you.

19          THE COURT:  Defense counsel, any recross?

20          MR. SHUBER:  No, Your Honor.  Thank you.

21          THE COURT:  Sir, you may step down.

22          Plaintiff counsel, do you have additional

23   witnesses to present?

24          MR. KROECK:  No, Your Honor.  Plaintiff rests

25   on their briefs.

David Soboslay - Direct

1          THE COURT:  Okay.

2          Defense counsel, you may proceed with your

3   first witness.

4          MR. SHUBER:  Thank you, Your Honor.

5          Defendants would call David Soboslay to the

6   stand.

7          THE DEPUTY CLERK:  Raise your right hand.

8          DAVID SOBOSLAY, a witness herein,

9   having been duly sworn, testified as follows:

10                    DIRECT EXAMINATION

11  BY MR. SHUBER:

12  Q.   Good afternoon, Mr. Soboslay.

13          Could you please state your full name and

14  spell it for the court reporter.

15  A.   Sure.  First name David.  Last name Soboslay,

16  S-o-b-o-s-l-a-y.

17  Q.   Is it okay if I gave you Dave?

18  A.   That's fine.

19  Q.   Thank you.  Dave, what is your current position

20  with the Borough?

21  A.   I'm the assistant manager for the Borough of Plum.

22  Q.   How long have you been the assistant manager for

23  the Borough of Plum?

24  A.   June of this year will be eight years.

25  Q.   Prior to being the assistant manager of the Borough

**David Soboslay - Direct**

1    of Plum, did you hold any other positions with the

2    Borough of Plum?

3    A.    I did not.

4    Q.    What did you do before that?

5    A.    Since the early '90s, I worked in local government

6    as well as in the private sector all based around the

7    government, working for the Borough of Dormont, working

8    for the Township of Allegheny, Westmoreland County.  I

9    worked for Delta Development, a private development firm

10   based out of Mechanicsburg, and then to the Borough of

11   Plum.

12   Q.    How long have you been in municipal government in

13   terms of years?

14   A.    30 years.

15   Q.    Over your 30 years in municipal government, are you

16   familiar with both zoning and code issues?

17   A.    I am.

18   Q.    Can you tell the Court a little bit about your

19   general experience first with zoning issues?

20   A.    So going back to my first job in local government,

21   I was the zoning officer in Dormont Borough.  I was

22   there for eight or nine years.  I was involved in

23   day-to-day zoning issues, as well as zoning appeals to

24   the Zoning Hearing Board and other bodies after that.

25          Code enforcement is part of that community

**David Soboslay - Direct**

1  development umbrella.  So you have building inspection,

2  permit issuance, code enforcement, zoning and at times

3  they come together.  At times they are unrelated but I'm

4  familiar with code enforcement and zoning.

5  Q.   As part of your duties as the assistant borough

6  manager, do you oversee zoning matters?

7  A.   I do.

8  Q.   As part of your duties as assistant borough

9  manager, do you oversee code enforcement matters?

10  A.   I do.

11  Q.   Who is the current building code official at the

12  Borough of Plum?

13  A.   The current building code official is Sam Prokopik.

14  Q.   Who was the former building code official?

15  A.   Heather Oravitz.

16  Q.   Is Ms. Oravitz a named defendant in this lawsuit?

17  A.   I could not tell you.

18  Q.   Let's just say it this way.  Was Ms. Oravitz the

19  building code official during the time period of the

20  matter complained of in this complaint?

21  A.   She was.

22  Q.   Who is the zoning officer at the Borough of Plum?

23  A.   Who is the zoning officer?

24  Q.   Yes.

25  A.   Heather Oravitz.

**David Soboslay - Direct**

1  Q.   What is Kevin Fields' position with the Borough of

2  Plum?

3  A.   Kevin Fields is the Borough code enforcement

4  officer.

5  Q.   As part of your duties as the assistant borough

6  manager do you oversee both Ms. Oravitz and Mr. Fields?

7  A.   I do.

8  Q.   As the assistant borough manager would you be

9  familiar with the duties that both of those persons

10  perform with the Borough of Plum?

11  A.   Yes.

12  Q.   And this afternoon would you be prepared to testify

13  as to both of their responsibilities within the Borough

14  of Plum?

15  A.   Sure.

16  Q.   Are you familiar with the Michael Lamia matter that

17  is before the Court this afternoon?

18  A.   I am.

19  Q.   Now, I might get a long response to this question

20  but what was your first interaction with Mr. Lamia at

21  the Borough of Plum to the best of your recollection?

22  A.   I remember two different issues that I interacted

23  with Mr. Lamia on.

24        One was the issue with the grading permit

25  based on the letters that were issued by Ms. Oravitz.

**David Soboslay - Direct**

1   Mr. Lamia and I also had phone conversations about
2   subdivision of his property.  It may have been one or
3   two conversations, not very long, dealing with the sale
4   of his property and the possible subdivision of the
5   property.
6   Q.   Prior to coming to court this afternoon, have you
7   ever prepared a timeline about your interactions with
8   Mr. Lamia?
9   A.   Yes.  As our staff was preparing for Mr. Lamia's
10  zoning hearing appeal, we created a timeline for that
11  hearing in case we needed to reference it.
12  Q.   Would it be helpful to your testimony this
13  afternoon if you were able to use that timeline to
14  refresh your recollection of events with Mr. Lamia?
15  A.   Yes.
16       MR. SHUBER:  Counsel, I included a copy of the
17  timeline as tab 22.
18       THE COURT:  Counsel, are you seeking to admit
19  tab 22 or simply use it to allow the witness to use it
20  to refresh his recollection?
21       MR. SHUBER:  Simply use it to allow the
22  witness to refresh his recollection.
23       MR. KROECK:  I ask did he create this timeline
24  or was he involved in the creation of the time.
25       MR. SHUBER:  I think that was his testimony.

**David Soboslay - Direct**

1  A.   Yes.  Myself along with staff put this timeline

2  together.

3          MR. KROECK:  No objection.

4  Q.   Dave, starting with the first entry, can you tell

5  the Court in brief terms what that issue involved?

6  A.   Sure.  In February of 2017, a grading violation was

7  identified and the letter was sent to Mr. Lamia.  He was

8  to obtain a permit and remove fill and the notes show

9  there were multiple pictures sent to him with that

10  letter.

11  Q.   Just so the record is clear, what's been marked

12  previously in this matter as Defense Exhibit E I think,

13  but what's been also referred to as tab 9, you can turn

14  to tab 9 in your binder, Exhibit A.  Let me know when

15  you have had a chance to review that.

16          Is that the same February 22, 2017 letter that

17  you reference in your timeline?

18  A.   It is.

19  Q.   Did you oversee Ms. Oravitz's preparation of this

20  February 22, 2017 letter?

21  A.   Yes, we were involved with that as staff.

22  Q.   So you are familiar with the contents of the

23  letter?

24  A.   I am.

25  Q.   If I asked you to describe to the Court in general

1  terms what the grading permit violation was, would you

2  be able to do that?

3  A.    I think so.

4  Q.    Please proceed.

5  A.    So Ms. Oravitz observed, as you can see in the

6  pictures that were submitted with the letter, the

7  grading violation along the hillside there.  There were

8  numerous pictures that were submitted and when we

9  have -- and it's a common thing we run across.  When

10  there is fill brought into a site, we want to make sure

11  the fill is done correctly, that a grading permit is

12  obtained.

13        We're asking the applicant to submit items

14  identified in the grading ordinance so that our

15  engineers can review it and make a determination of

16  whether or not they're moving in the right direction.

17        Our goal is to get a permit issued so that the

18  property owner would be in compliance with the

19  ordinances.

20  Q.    Now, within the letter and within your timeline,

21  there are photographs that are referenced that I believe

22  you said that Ms. Oravitz took, correct?

23  A.    Most of them were taken by Ms. Oravitz.  I do have

24  a recollection of taking one of those myself.

25  Q.    Thank you.  So you do have a recollection of the

1  photographs that were sent with the letter, correct?

2  A.   That is correct.

3  Q.   If you could turn to tab 20 in your binder.  Let me

4  know when you have had a chance to review.  I'll

5  represent to you those are photographs.

6  A.   Okay.

7  Q.   Would it be a fair and accurate representation that

8  these photographs were the same photographs that were

9  submitted with the February 22, 2017 letter?

10 A.   I would say some of these were sent with the

11 letter.  I did not mail the letter myself but these are

12 the pictures that staff reviewed at the time the letter

13 was sent to Mr. Lamia.

14 Q.   Let me ask it to you this way.  Would you be able

15 to identify the photographs in tab 20 that were sent

16 with the letter by Ms. Oravitz for the most part?

17 A.   I can tell you what they represent, yes.

18       MR. SHUBER:  Your Honor, I would like to move

19 for the admission of the photographs in tab 20 as

20 Defendant's Exhibit C.

21       THE COURT:  Any objection?

22       MR. KROECK:  I'm going to object.  He didn't

23 take the photographs and he stated some of them may have

24 been reviewed but they didn't all go out with the

25 letter.  I guess if he can go through each photograph

David Soboslay - Direct

1  individually and say which one he is familiar with.

2          THE WITNESS:  I'm familiar with all the photos

3  as they are -- as they represent the property.

4          MR. SHUBER:  Your Honor, I would say the

5  appropriate foundation has been laid.  I laid the

6  foundation that Mr. Soboslay has direct oversight of all

7  the responsibilities that Ms. Oravitz has.  He testified

8  very clearly that as part of those duties, he oversees

9  her work which included the authorship of this letter

10  which contained the photographs.

11          He also testified to the Court that he had an

12  opportunity to review the letter and he is familiar with

13  the photos which he has actually also identified in this

14  timeline.

15          So I think the appropriate foundation has been

16  laid for him to testify as to the photographs.

17          THE COURT:  Is he able to say whether the

18  photographs represent a fair and accurate description of

19  the property?

20  Q.   Would you be able to say that the photographs are a

21  fair and accurate description of the property located at

22  103 McJunkin?

23  A.   They are.

24          THE COURT:  With that, plaintiff's counsel,

25  any objection to the admission of the photographs?

**David Soboslay - Direct**

1          MR. KROECK:  Has he been to the property?

2    Yes, I would object.  I don't know that he has been to

3    the property to say that the photographs are a fair and

4    accurate representation.

5          THE COURT:  Well, he just testified that the

6    photos are a fair and accurate representation of the

7    property.

8          MR. KROECK:  I would just ask if he has

9    actually been to the property.

10   Q.   Dave, have you been to the property at 103

11   McJunkin?

12   A.   I have.

13   Q.   How many times have you been at the property at 103

14   McJunkin?  Would you say numerous?

15   A.   I would.  More than one.

16   Q.   So are you able to represent that these photographs

17   are a fair and accurate representation of the property

18   based upon your firsthand knowledge and your

19   observations at the property itself?

20   A.   I am.

21          THE COURT:  I find that an appropriate

22   foundation has been laid for admission of the photos at

23   tab 20.  How are those photos going to be referred to

24   for the record, counsel?

25          MR. SHUBER:  They will be referred to as

1  Defendants Exhibit C, Your Honor.

2          THE COURT:  Okay.  Defendants Exhibit C is

3  admitted.

4  Q.  Dave, I would like to start with the first

5  photograph in tab 20.  Let me know when you are able to

6  get there.

7  A.  I'm there.

8  Q.  There's been some testimony this afternoon with

9  reference to a hillside.  Do you recall that testimony?

10  A.  Yes.

11  Q.  Is this photograph an accurate depiction of the

12  hillside that's been referred to in this afternoon's

13  hearing?

14  A.  It is.

15  Q.  Could you describe to the Court in your own words

16  what is depicted in this photograph?

17  A.  The picture shows a hillside strewn with various

18  trees, as well as concrete chunks and some bricks on the

19  hillside, from the top of the hillside down to as far as

20  we can see at the bottom of the photograph.

21  Q.  Thank you.  If you look at the second photograph in

22  tab 20.  Let me know when you have had a chance to get

23  there.

24  A.  Yes.

25  Q.  I believe the best visual of the photograph would

David Soboslay - Direct

1    be if it was turned --

2    A.   Landscape.

3    Q.   Is that an accurate depiction of the same hillside

4    that's been referred to in today's testimony?

5    A.   Yes.  It's a picture taken from McJunkin Road.  The

6    house here borders the corner lot and it borders

7    McJunkin Road and Center New Texas Road.

8            This is looking from McJunkin Road across the

9    back of the hillside of 103 McJunkin.

10   Q.   If you turn to the next page, Page 3 of tab 20.

11   Let me know when you are there.

12   A.   Yes.

13   Q.   Is the road that you just described as McJunkin

14   Road depicted in that photograph?

15   A.   Yes.

16   Q.   If you go to the next photograph, Page 4 of tab 20,

17   is the road pictured in that photograph also McJunkin

18   Road?

19   A.   Yes.

20   Q.   Is the rook pile through the trees the same

21   hillside that we have been referring to?

22   A.   It is.

23   Q.   Now, in this photograph it looks like there are

24   also some additional structures on the property.  You've

25   testified earlier that you have been to the property so

**David Soboslay - Direct**

1  you are familiar with it, correct?

2  A.   I am.

3  Q.   Can you tell the Court what those other structures

4  would be starting from left to right.   The left is the

5  lightest structure.

6  A.   On the left it appears to be at the house there.

7  As we go to the right, as the property bends around so I

8  only have a black and white picture here, so that

9  structure would be in the general area of the carport

10  that Mr. Lamia referred to.   Whether that structure is

11  the carport, I cannot tell.

12  Q.   Let me do it this way.   If you turn to what would

13  be Page 6 --

14  A.   We were just looking at four.

15  Q.   Turn two more pages ahead.   Stop when you get to

16  the trailer and there's a little bit clearer view.

17  A.   Yes.   What I had trouble making out in photo No. 4,

18  in photo No. 6 is clearly seen as a trailer.

19  Q.   Behind the trailer is what?

20  A.   Appears to be the carport that Mr. Lamia previously

21  mentioned.

22  Q.   Is this the same carport that you heard Mr. Lamia

23  testify to this afternoon?

24  A.   I believe it is.

25  Q.   There was also some testimony this afternoon

**David Soboslay - Direct**

1  relative to a garage, correct?

2  A.   I did hear Mr. Lamia testify to that, yes.

3  Q.   Are you familiar with that matter?

4  A.   I am not.

5  Q.   If you go two more photos ahead, there's a little

6  bit more greenery in another picture of the rocks.  Let

7  me know when you're there.

8  A.   I'm there.

9  Q.   Again, is that the same hillside that's been

10 referred to in this afternoon's hearing?

11 A.   Yes.

12 Q.   If you would flip ahead to tab 20 in the first

13 photograph that depicts bricks.  Let me know when you're

14 there.

15          (Pause in the proceedings.)

16 A.   That it -- tell me how many after.

17 Q.   There's so many --

18 A.   There's bricks in so many.

19          MR. SHUBER:  May I approach, Your Honor?

20          THE COURT:  You may.

21          (Pause in the proceedings.)

22 Q.   So you are now looking at the photograph that

23 depicts the bricks, correct?

24 A.   Correct.

25 Q.   Is this the same hillside that's been referred to

**David Soboslay - Direct**

1  in this afternoon's hearing?

2  A.    It is.  It's taken from a different angle but it is

3  the same hillside.

4  Q.    To the best of your knowledge, is the condition of

5  this hillside the exact same today as it is in these

6  photographs?

7  A.    I think all I can testify to is that it's the same

8  as Mr. Lamia testified to as nothing has been done to

9  remove the rumble on the hillside.

10          This picture here depicts a picture that I

11  took myself in I think it was May of 2022 as we were

12  prepping for Mr. Lamia's appeal to the Zoning Hearing

13  Board.

14          These bricks are on the top of the slope -- he

15  said it was taken from a different angle but these were

16  sitting at the top of the slope at that time.

17  Q.    So to the best of your knowledge, I think you

18  already testified to, but I just want to make sure,

19  Mr. Lamia has done nothing to bring the property into

20  compliance as it relates to the hillside, correct?

21  A.    I'm unaware of any activity there.  I think I heard

22  Mr. Lamia testify that that is the case.

23  Q.    Thank you.  So there has been testimony in the case

24  this afternoon related to occupancy permits, correct?

25  A.    Correct.

**David Soboslay - Direct**

1   Q.   Mr. Lamia has applied for occupancy permits on at

2   least two occasions, correct?

3   A.   Related to this case that I'm aware of, yes.

4   Q.   Why typically would someone apply for the issuance

5   of an occupancy permit within the Borough of Plum?

6   A.   For the most part, someone is purchasing a house,

7   selling a house, and this is the traditional method by

8   which the Borough of Plum goes out to review these

9   properties and our inspector would find if there were

10  any violations of those properties.

11          During that process, letters are issued about

12  violations and the homeowners that want to sell their

13  properties, they comply, they fix these things and there

14  are reinspections, and we issue the occupancy permit.

15  Q.   I want to break that down a bit.  So in your

16  experience as the assistant borough manager, how many

17  applications for occupancy permits would you say you get

18  on an annual basis?

19  A.   I don't handle those.  They are not sent to my

20  attention.  I oversee this.  Needless to say they are in

21  the hundreds.  Not only do we inspect single family

22  homes but we on the five-year basis do occupancy permits

23  for apartment buildings.  So over the course of a year,

24  there are hundreds and hundreds of occupancy permits

25  that we issue.

**David Soboslay - Direct**

1   Q.   Out of those hundreds of occupancy permits, how

2   many of those would typically be denied?

3   A.   Very few.  You want an exact number but the person

4   applying for the occupancy permit, their goal is to sell

5   the house.  We identify the issues.  They correct the

6   issues, and we issue the occupancy permit.

7            Everyone is working toward the same goal of

8   getting that house sold.  Your goal is to fix the items

9   that we identify.  We want to make sure the house is in

10  good shape for the buyer.  So the process works pretty

11  smoothly.

12  Q.   Is it fair to say then in most circumstances,

13  property owners will bring whatever violations are noted

14  as part of those inspections into compliance in order to

15  sell their home?

16  A.   They do.

17  Q.   Before I get to the next exhibit, you also

18  mentioned violations.  Would these be considered

19  substantial violations?

20  A.   We're talking about Mr. Lamia's property?

21  Q.   First, I want to talk about generally.  The

22  violations that you testified to about moments ago were

23  part of the inspections that were done -- that are done

24  on a regular basis for the Borough of Plum, correct?

25  A.    Correct.

**David Soboslay - Direct**

1  Q.   Are those violations the violations that are
2  referred to as substantial violations?
3  A.   There's a mixture.  You have some that are simple
4  and some that are substantial.
5  Q.   Okay.  Explain the difference to the Court, first
6  starting with simple violations.
7  A.   I'm not a certified code enforcement officer but in
8  my mind, a simple violation is when the code enforcement
9  officer goes out and reviews stairs whether they are
10 internal, external to the house.  The code would say
11 that for every four risers, you need to have a handrail.
12 That is a pretty simple violation.
13            We inspect for fire alarms.  Are these fire
14 alarms within the house interconnected in case of an
15 emergency.  Pretty common everyday code enforcement
16 violations that we run into during inspections.
17 Q.   Can you next describe for the Court substantial
18 violations?
19 A.   In my mind, substantial violations is something
20 that has an issue with safety.  In this case with
21 Mr. Lamia, we have this hillside that in a letter
22 identified by our borough engineer of safety concerns,
23 not only safety concerns with the existing concrete
24 there but with -- I know we haven't talked about this
25 letter yet, but concerns about how that hillside may

1    move.

2           In another instance, we had a property within

3    the last few years where our code enforcement officer

4    did an inspection with a swimming pool.  That swimming

5    pool was external to the house but there were issues

6    with that swimming pool that were safety issues that

7    prevented us from issuing any sort of occupancy permit

8    because it was a substantial code violation.

9    Q.   So, based upon your knowledge, if there is a

10   substantial violation, the borough would deny an

11   occupancy permit?

12   A.   That is correct.

13   Q.   In your view, all the photographs that I showed you

14   of the hillside that has been referred to in this case

15   would represent a substantial violation?

16   A.   Yes.

17   Q.   I would like to direct your attention to tab 2.

18   Let me know when you have had a chance to review the

19   document.

20           (Pause in the proceedings.)

21   A.   Okay.

22   Q.   Is that your signature at the bottom of the

23   document?

24   A.   It's my electronic signature.

25   Q.   Is this document an email from you to

**David Soboslay - Direct**

1   MichaelLamiaContractingLLC@Gmail.com sent on Monday
2   December 6, 2021 at 9:26 a.m.?
3   A.    It is.
4   Q.    Are you familiar with the contents of this email?
5   A.    I am.
6           MR. SHUBER:  Your Honor, I would ask to move
7   to admit the email at tab two at Defendant's Exhibit D.
8           THE COURT:  Plaintiff's counsel, any
9   objection?
10          MR. KROECK:  No, Your Honor.
11          THE COURT:  All right.  Defendants Exhibit D
12  is admitted without objection.
13  Q.    Dave, can you describe in general terms the
14  contents of this email to the court?
15  A.    I think the email as I try to do with a lot of my
16  emails is sort of walk through a chronological
17  description or review of the issue.
18          Talk about the application for the occupancy
19  permit.  In paragraph 2, we talk about the resolution of
20  the problem.  We're trying to direct the applicant on
21  how to resolve the problem.  We ask the applicant to
22  submit a grading permit application.
23          In paragraph No. 3, it talks about the
24  application that we did receive and how it was rejected
25  by the borough engineer as inadequate.

 1          The next paragraph talks about we're looking

 2    forward to receiving his revised application with the

 3    information so it can be reviewed.

 4          At the end of the email, I talk about -- there

 5    was a big push to sell the property at this time.  I

 6    said, we're not holding you back from selling the

 7    property.  We're just not issuing an occupancy permit at

 8    this time.

 9    Q.   Wouldn't that still be true today?

10    A.   It is.

11    Q.   So is it fair to say all you're asking of Mr. Lamia

12    is to bring the property into compliance?

13    A.   That has always been our goal and is our goal.  We

14    want to make sure that problem is taken care of and that

15    the property -- there is no issues of someone getting

16    hurt on the hillside or that hillside sliding.

17          That's our No. 1 item that we want taken care

18    of here.  We hope that he can take care of it and then

19    he can sell his property.

20    Q.   Dave, I think you told me you have over 30 years in

21    public sector work?

22    A.   That is correct.

23    Q.   Wouldn't the public have an interest in making sure

24    that properties are in compliance with local zoning and

25    codes?

1  A.   That's why local government exist is to provide

2  some sort of structure and semblance of order for the

3  development of property, code enforcement of property.

4        Without the existence of code enforcement and

5  zoning, you would have chaos.  There are some

6  communities that don't have these items.  You look and

7  see -- you know, there are some communities in

8  Westmoreland County that don't have zoning.  You have

9  residential uses on top of commercial uses.

10        So certainly we want to -- I think if you look

11  at -- if you look at the introduction to our zoning

12  ordinance, it talks about the health, safety and welfare

13  and the orderly development of the borough.  So that

14  preamble sets the stage for the actual administration

15  and enforcement of zoning ordinance.

16  Q.   So it's fair to say that all those things would

17  absolutely weigh into the Borough's decision when

18  granting occupancy permits, correct?

19  A.   That is correct.

20  Q.   I have a few more questions for you.  There's been

21  some testimony also this afternoon that Mr. Lamia

22  appealed to the Zoning Hearing Board, correct?

23  A.   That's correct.

24  Q.   You were a participant in that Zoning Hearing Board

25  hearing, correct?

David Soboslay - Direct

1   A.   I was.

2   Q.   In your capacity as a participant in the Zoning

3   Hearing Board hearing, are you familiar with the final

4   decision that was made by the Zoning Hearing Board?

5   A.   I am.

6   Q.   If I can direct your attention to tab 11.  Let me

7   know when you have had a chance to review this.

8            (Pause in the proceedings.)

9   A.   Okay.

10  Q.   Is this the same decision that I just referred to

11  in my earlier questions to you?

12  A.   It is.

13  Q.   Would you be prepared to testify as to the contents

14  of the decision that was rendered by the Zoning Hearing

15  Board?

16  A.   Yes.

17            MR. SHUBER:  Your Honor, I would move for the

18  admission of tab 11 which would be marked as Defendant's

19  Exhibit E in these proceedings.

20            THE COURT:  Plaintiff's counsel, any

21  objection?

22            MR. KROECK:  No, Your Honor.

23            THE COURT:  All right.  Defendant's Exhibit E

24  will be admitted without objection.

25  Q.   Have you had a chance to review the document?

David Soboslay - Direct

1    A.    Yes.

2    Q.    I would like you to provide a summary of the Zoning

3    Hearing Board's decision as it related to Mr. Lamia's

4    appeal?

5    A.    I think it can be summed up if you look at item 11

6    on the second page of the decision.  It says, this

7    appeal is denied because the Zoning Hearing Board lacks

8    the jurisdiction to consider the appeal.

9    Q.    To your knowledge, after this decision was

10   rendered, was Mr. Lamia provided information on how to

11   correctly appeal the denial of the occupancy permit?

12   A.    So the procedure would be that the solicitor for

13   the Zoning Hearing Board, he would draft his findings of

14   facts and conclusions of law and there would be a

15   notification sent to the applicant outlining the

16   procedure.

17          I do believe -- I can't say it was said in

18   this case but the Zoning Hearing Board solicitor on a

19   regular -- routinely they have is that if you are

20   unhappy with the decision of the Zoning Hearing Board,

21   that that decision can be appealed to the Court of

22   Common Pleas within the next number of days.

23   Q.    Additionally, there was also an avenue for

24   Mr. Lamia to appeal to the whole council, correct?

25   A.    Correct.  The grading ordinance No. 321 provides

**David Soboslay - Direct**

1  for an appeal to borough council.

2  Q.   To your knowledge, did Mr. Lamia appeal in either

3  avenue?

4  A.   I'm unaware of an appeal on either fronts.

5  Q.   If the Court were to deny the injunction,

6  which would in effect deny the issuance of another

7  occupancy permit, would Mr. Lamia have the same appeal

8  avenues that you just described to the Court available

9  to him?

10  A.   Repeat that again, please.

11  Q.   Yes.  Let me ask it in a simpler way.  If the

12  occupancy permit that is the subject of today's hearing

13  is ultimately denied, there's no injunction granted,

14  would Mr. Lamia be able to appeal the denial of the

15  occupancy permit in the same way that you just described

16  to the Court?

17  A.   Yes.

18  Q.   So there would be no prevention from him having the

19  opportunity to do that, correct?

20  A.   That's correct.

21        MR. SHUBER:  Your Honor, I have no further

22  questions for the witness.

23        THE COURT:  Plaintiff's counsel, do you have

24  cross-examination of this witness?

25        MR. KROECK:  Very briefly, Your Honor.

1                        CROSS-EXAMINATION

2    BY MR. KROECK:

3    Q.    How are you today?

4    A.    Fine.   How about yourself?

5    Q.    Good.   Thank you.

6              You stated you work for the Borough eight

7    years, correct?

8    A.    Coming on eight years in June, correct.

9    Q.    Did you ever see the condition of this property

10   prior to starting with Plum?

11   A.    I'm sure I have.  I live in Plum Borough, I'm a

12   resident of Plum Borough and have been a resident of

13   Plum Borough for 25 years.  I'm familiar with the house

14   and the location of the house.

15   Q.    Do you ever remember the hillside in question

16   seeing it without the concrete on it?

17   A.    So, I would say that my familiarity with

18   Mr. Lamia's property prior to working with the Borough

19   is simply driving on Center New Texas Road in front of

20   the house.  I had no reason to go down the side street

21   of McJunkin to see any of that.

22              Prior to my employment there, I couldn't tell

23   you anything beyond the fact that there was a carport

24   down the side of that property because that's visible

25   from Center New Texas Road.

David Soboslay - Cross

1  Q.   So, no, you can't remember the property without the

2  concrete?

3  A.   I'm saying I'm unable to say I drove down there to

4  see that.  So, yes, I'm not familiar with it beyond my

5  employment with the Borough.

6  Q.   Did you ever see Mr. Lamia dumping any concrete on

7  the property?

8  A.   I did not.

9  Q.   Do you know if concrete can be considered clean

10 fill?

11 A.   I think that's a question for the engineer.  I

12 think concrete if it's properly -- your big chunks of

13 concrete, probably have issues with.  Smaller chunks I

14 would defer to the engineer on that if that could

15 possibly be used as clean fill.

16 Q.   Just in your knowledge as borough manager, it can

17 be used as clean fill?

18 A.   I'm saying it's a possibility it could be used as

19 clean fill.

20 Q.   Did any portion of this violation issued under 321

21 relate to the structure of Mr. Lamia's home?

22 A.   Repeat the question again.

23 Q.   Of course.  The violation that you've issued or

24 that Plum issued, did any portion of it relate to his

25 actual physical structure of his house?

**David Soboslay - Cross**

1    A.   The violation that was sent by Ms. Oravitz relates

2    to the hillside and the grading permit that we

3    requested.

4              However, when we consider occupancy permits

5    for properties, we have a number of things to consider.

6    Not only do we consider the items inside the house, we

7    consider the general state and safety of the property.

8    Q.   Same question.  Did it relate to this -- did this

9    issue relate to the structure of property?

10   A.   When you say "this issue," are you talking about

11   the letters issued by Ms. Oravitz?

12   Q.   I'm talking about the grading issue, yes.

13   A.   No, it did not.

14   Q.   Okay.  Thank you.  So Plum does deny occupancy

15   based on nonstructural issues?

16   A.   There are many things to consider when issuing an

17   occupancy.  Not only do we look at issues on the side of

18   the house, we look at general safety of the property.

19   If we were to issue an occupancy permit where we knew by

20   letter of our borough engineer that there was a

21   dangerous situation -- you know, that just can't happen.

22             So, yes, we look at a number of factors when

23   dealing with occupancy permit issues.

24   Q.   Do you know if ordinance 321, the grading

25   ordinance, does it contemplate as a penalty denial of

David Soboslay - Cross

1  zoning, denial of occupancy rather?

2  A.    Ordinance 321 is a pretty long and old ordinance,

3  so I would say that we would use that as reference

4  material.  I don't know all the ins and outs of that

5  ordinance.

6  Q.    For nonstructural issues, could code enforcement be

7  used to enforce them?

8  A.    Such as?

9  Q.    Such as grading or alleged dumping.

10 A.    Yes.  So there are a number of times in our code

11 enforcement -- so, our code enforcement officer is out

12 and about throughout the Borough every day.  He sees

13 these things.  He identifies these things.

14        If there were issues like that, he could

15 possibly send a letter.  Whether he would or not, I

16 don't know.

17        The code enforcement officer's main duty right

18 now is to deal with occupancy permit issues.  I

19 testified earlier we have hundreds of these that we

20 issue every year.  I would say that 99 percent of his

21 focus is on occupancy permit issues.

22 Q.    Do you know why a temporary occupancy permit wasn't

23 issued here to allow this sale to go through?

24 A.    I do not.

25 Q.    To the best of your knowledge, has council itself

David Soboslay - Cross

1  ever issued an occupancy permit?

2  A.  I don't believe council has the ability to issue an

3  occupancy permit.

4  Q.  So if Mr. Lamia was to have filed as council stated

5  an appeal to council, they wouldn't have been able to

6  issue occupancy?

7  A.  I think council would hear the appeal and direct

8  the staff to -- if they found in Mr. Lamia's favor,

9  direct the staff to issue the occupancy permit.

10  Q.  But you just stated council itself would not do

11  that?

12  A.  On a day-to-day basis, no, they do not issue

13  permits.

14          MR. KROECK:  Thank you.

15          THE COURT:  Any redirect for this witness?

16          MR. SHUBER:  No.

17          THE COURT:  Thank you, sir.  You may step

18  down.

19          Ms. McNulty, give the parties an update on

20  elapsed time or time remaining items, please.

21          THE LAW CLERK:  Plaintiff has 52 minutes left.

22  Defendants have 37 minutes left.

23          THE COURT:  Thank you.

24          MR. SHUBER:  Thank you, Your Honor.

25          My only other witness would be Harold

1    McCutcheon.  He is the engineer.  He actually just asked

2    me if it would be okay if we could take a break to use

3    the restroom.

4              THE COURT:  Yes, we can take a ten-minute

5    break.  It's 2:35 right now.  We will resume at

6    2:45 p.m.

7              (Whereupon, a break was taken.)

8              THE COURT:  Defense counsel, you may proceed

9    with your next witness.

10             MR. SHUBER:  Thank you, Your Honor.

11             Defendants would call Harold McCutcheon to the

12   stand.

13             HAROLD MCCUTCHEON, a witness herein,

14   having been duly sworn, testified as follows:

15             THE COURT:  Sir, would you mind stating and

16   spelling your name into the microphone.

17             THE WITNESS:  Harold McCutcheon,

18   m-c-c-u-t-c-h-e-o-n.

19             THE COURT:  Thank you.

20             Counsel, you may proceed.

21                     DIRECT EXAMINATION

22   BY MR. SHUBER:

23   Q.   Mr. McCutcheon, do you go by Harold?

24   A.   Legally but I prefer Bud.

25   Q.   May I call you Bud?

**Harold McCutcheon - Direct**

1   A.   Yes, you may.

2          MR. SHUBER:  Your Honor, I had a chance to

3   briefly speak to opposing counsel at the break.  I would

4   like to offer Mr. McCutcheon's curriculum vitae to

5   refresh his recollection.

6          THE COURT:  Any opposition to that,

7   plaintiff's counsel?

8          MR. KROECK:  No opposition, but if he reads

9   the whole thing, he will run of time today.  It's quite

10  the CV.

11         THE COURT:  Fair enough.  Please proceed.

12         MR. SHUBER:  Thank you, Your Honor.

13  Q.   Bud, with that comment in mind, I would like you to

14  tell the Court in the most expedited yet efficient way

15  that you can a little bit about your qualifications and

16  what you do for a living.

17  A.    Okay.  My background is I graduated from Pitt.  My

18  bachelor's is Carnegie Mellon in 1983.  My master's is

19  in civil engineering focusing on structures and

20  geotechnical engineering.

21         For the past 40 years, I have been doing land

22  development, landslides, retaining walls, stormwater,

23  grading permits, applications to municipalities, any

24  number of different related activities over the years.

25  Q.   Who is your current employer?

**Harold McCutcheon - Direct**

1  A.    KU Resources.

2  Q.    How long have you been at KU Resources?

3  A.    As of October this year, 20 years.

4  Q.    Can you describe your position within KU Resources

5  for the Court.

6  A.    I am chief engineer for the company, have been

7  since I joined them.  I got overall technical

8  responsibilities for the work products issued by the

9  firm from a technical standpoint.

10  Q.    Is it fair to say that you're the boss when it

11  comes to engineering?

12  A.    No, not exactly.  The technical aspects, yes.  I

13  don't do personnel management.  We got different teams

14  set up with different managers and vice presidents but I

15  got the overall technical oversight.

16  Q.    How long have you been -- strike that.

17         Are you the Borough of Plum's engineer?

18  A.    KU Resources is the Borough engineer.  I'm not the

19  engineer in KU that represents the Borough.  I'm called

20  in for special cases.

21  Q.    To your knowledge, how long has KU Resources been

22  the Borough's engineer?

23  A.    I don't know because there was a former firm, RF

24  Mital that we purchased a couple years back.  I don't

25  know how long they were the Borough engineer beforehand.

**Harold McCutcheon - Direct**

1  Q.  Let me ask it to you this way.  Has your firm been

2  the Borough engineer for as long as the issues related

3  to 103 McJunkin Road have existed?

4  A.  Yes.

5  Q.  I've left the witness binder on the stand.  If I

6  can direct your attention to tab 7.  Let me know when

7  you're there.

8  A.  I'm there.

9  Q.  I would like to direct your attention to the last

10  page of the document at tab 7.  Is that your signature,

11  sir?

12  A.  Yes, it is.

13  Q.  Are you Harold McCutcheon?

14  A.  I am.

15  Q.  Your title is chief engineer?

16  A.  Yes.

17  Q.  For KU Resources, Incorporated, which is on the

18  front page of the document?

19  A.  Correct.

20  Q.  Is it fair to say that this is a copy of your

21  report prepared for the Borough of Plum on May 12, 2022?

22  A.  It is.

23          MR. SHUBER:  Your Honor, I would move for the

24  admission of the document at tab 7 as Exhibit N.

25          THE COURT:  Plaintiff counsel, any objection?

**Harold McCutcheon - Direct**

1            MR. KROECK:  No objection.

2            THE COURT:  Defendants Exhibit F will be

3    admitted without objection.

4    Q.   So, Bud, you prepared this report on May 12, 2022?

5    A.   Correct.

6    Q.   It's related to the address located at 103 McJunkin

7    Road in the Borough of Plum, correct?

8    A.   It is.

9    Q.   To your knowledge is that the same property that's

10   been described during today's proceedings?

11   A.   It is.

12   Q.   That's the property that is currently owned by

13   Michael Lamia, correct?

14   A.   That's my understanding, yes.

15   Q.   There's a lot in this report.  What I would like

16   you to do is go through the report item by item starting

17   at No. 1 and briefly describe the importance of why you

18   included it in your report to the Court?

19   A.   This report was based on a site visit I conducted a

20   few days beforehand with members of the municipality and

21   inspecting the slope area in particular.  I identified

22   12 issues that I had with the fill that was there at

23   that time that I thought that needed to be addressed.

24            Going in order, No. 1, there was a lot of

25   different materials, as we already identified, concrete,

1  brick, gravel present on the surface that I have a

2  concern with and whether similar or even different

3  materials are buried within the slope.

4          No. 2, it's unclear where this material came

5  from.  I note that while concrete brick and asphalt

6  can't be considered clean fill environmentally doesn't

7  mean that it's good fill unless it's properly sized,

8  compacted and placed in lifts.

9  Q.   Let me stop you there.  There was some testimony

10  during today's proceedings about clean fill.  I think

11  you were present in the courtroom when Mr. Soboslay was

12  shown the photographs, correct?

13  A.   Yes.

14  Q.   In those photographs that were marked as Defendants

15  Exhibit C in today's proceedings, would you describe

16  that as clean fill?

17  A.   I can't describe it without it being tested.  It

18  can be considered if it hasn't come from a gas station

19  or some other area that it could have been contaminated

20  before it was brought to the site.

21  Q.   Can you describe for the Court then what the clean

22  fill testing process as I think you outlined in point 2

23  would entail?

24  A.   Typically before something comes to a site, it

25  should be sampled and other guys in my office do this.

**Harold McCutcheon - Direct**

1  It's on the order of 12 samples for 3,000 cubic yards

2  and tested for a whole suite of different chemical

3  constituents both organic compounds, metals, things like

4  that.

5          Physically, the concrete can be cleaned but is

6  it contaminated with something else.  That's what the

7  clean fill policy tries to prevent coming onto a site.

8  Q.   In this case, have you ever had an opportunity to

9  test the fill on the Lamia property?

10  A.   No, I did no testing.  Everything was visual.

11  Q.   But would one of the requirements from your point

12  of view be that testing would be necessary to complete?

13  A.   It should be tested just to see where it came from

14  or how bad it is if it truly is clean fill by the

15  definition of the state code.

16  Q.   If you could then move to the next point in your

17  report.

18  A.   Okay.  The third point I make is even though this

19  is construction demolition debris that might be

20  considered clean fill, there is the Solid Waste

21  Management Act that regulates this kind of material and

22  its placement.

23          No. 4, one of the bigger concerns is it

24  doesn't appear that the land from what I can tell was

25  prepared to receive this fill.  There's no evidence of a

1  keyway at the toe of the slope, whether this was all

2  placed over a weak topsoil layer that would be permitted

3  to slide.  There are things about this that we do not

4  know.

5          Likewise, No. 5, this material has been spread

6  around the trees that are growing through it.  My

7  concern is that as these trees die, anything that is

8  buttressed up against them has the propensity to want to

9  move and move down slope and there is material beyond

10  the toe of the slope that appears to have moved off onto

11  the flat lands below.

12  Q.   If you could then go to the next page of your

13  report on Page 2, paragraph 6.

14  A.   No. 6, just as I stated, no keyway that we know is

15  present even though the height of the fill would dictate

16  that per industry standard.

17          No. 7, looks like it was all end dumped.  It

18  was not placed in a controlled manner and compacted.

19  Like I said, even though it's clean fill, we want to see

20  it reduce down to size to like six inches in size,

21  placed in eight-inch lifts, compacted with a machine

22  before any more material is added to it.

23          THE COURT:  Counsel, may I ask a clarifying

24  question?

25          MR. SHUBER:  Yes, of course.

1          THE COURT:  Sir, can you please explain what a

2    keyway is.

3          THE WITNESS:  Sure.  A keyway is an excavation

4    at the bottom of the slope into the existing ground that

5    we use when we backfill, we use it to lock the toe of

6    the slope.  So the toe doesn't just want to continue to

7    creep down the hillside, it's buttressed against

8    material that is actually there.

9          THE COURT:  Thank you.

10   Q.   Now, Bud, in paragraph 8, I really want to have you

11   slow down a little bit and also slow down a little bit

12   for the court reporter so she can get everything down.

13          If you can look at paragraph 8 and describe

14   your opinion here and then also describe the photograph

15   to the Court, that would be really helpful.

16   A.   To me this is the key of the condition of the slope

17   beyond just the stability.  This is the surface of the

18   slope that the public is going to encounter.

19          There's a lot of disorganized concrete pieces

20   all over the place, some standing on end as you can see

21   virtually in the middle of that photograph, others

22   laying flat.

23          Everything has got the opportunity to roll and

24   slide down the hill at some point irrespective of a

25   landslide.

**Harold McCutcheon - Direct**

1          My concern is looking at this, as a child I
2    would have been all over this.  This is my kind of play
3    area.  As an adult, this is very dangerous because a kid
4    coming down here could get hurt trying to play around
5    these rocks if they are living on the property.
6          Because this whole area is unsecured, any
7    neighborhood kid could come down and play on this slope
8    and with Mr. Lamia not being present on the property,
9    who knows if there's anybody running around here looking
10   for snakes, looking for critters.
11   Q.   So, in your opinion, is the current condition of
12   the property as represented in your report dangerous?
13   A.   Yes.  I was involved in another matter a number of
14   years ago where a young child chased a ball over a hill
15   and caused some concrete to fall on him and he was
16   severely injured.
17   Q.   I'll note in your report the last part of that
18   paragraph right before the photograph, you say that it
19   presents an additional and greater danger to the
20   occupants and the visitors themselves.  Can you just
21   provide some further explanation to the Court with
22   regard to that sentence?
23   A.   Again, if you have a party -- if this house was
24   occupied and there was a party at the house, kids
25   playing around, this is an attractive nuance to them to

1    go see it.

2          If the children of the house are out there

3    playing and they'll say to their friends, hey come see

4    this at a birthday party, that could be a catastrophic

5    result.

6    Q.   And you may get to it a little bit later in your

7    report, but can you explain to the Court if there's also

8    a dangerous condition in the form of potential for a

9    landslide?

10   A.   Yes.  My concern in requesting things like test

11   pits to be dug to tell us what is there and I expressed

12   it with the lack of a keyway and possibly being dumped

13   over topsoil is, there is no information that says this

14   is truly a stable slope.

15          It may be at equilibrium right now but we

16   don't know what may cause something to trigger the

17   movement.  It could be somebody parking a car at the top

18   of the slope area because they are having a party and

19   it's a nice parking area.  That could trigger the slope

20   movement because it wasn't ever designed for it.

21   Q.   So there could be a trigger really at any time

22   given the current state of the property?

23   A.   Yes.

24   Q.   Let's move forward to paragraph 9 on Page 3 of your

25   report.

**Harold McCutcheon - Direct**

1  A.   This relates to things I saw in the grading

2  ordinance that were not present on the property.   I

3  estimated just based on some rough imagery about 1,800

4  cubic yards of material had been placed out there which

5  is in excess of the grading limits requirements.

6         The slope is not flattened out to a two-to-one

7  slope.   There was no grading plan presented to say this

8  was conforming to that.

9         Finally, the factor of safety on No. D is the

10  measure we use to say if something is stable, that the

11  resisting forces including stuff on top is one and a

12  half times the driving forces.

13  Q.   So break that last part down a little bit further

14  for the Court, if you could.

15  A.   When we look at a slope stability analysis, we take

16  a look at the conditions of the slope, the geometry, the

17  keyways, all the materials, their strength and figure

18  out how much resistance to movement is in that geometry,

19  the materials.

20         Then we look at the loads placed on it, be it

21  a vehicle on top, it's own dead weight, what is that

22  driving force and what is resisting that force.   It's

23  just a comparison of those two.

24  Q.   How would you again describe that as it relates to

25  the Lamia property?

**Harold McCutcheon - Direct**

1   A.   While I could probably tell you about putting a car

2   on top what the weight is going to be, I can't say with

3   any confidence what the resisting force is going to be.

4         From what I can see out there, there is a

5   higher probability than not there are any other

6   similarly properly constructed slope that this would

7   slide.

8   Q.   Let's move on to paragraph 10.

9   A.   Ten is just the requirement that any earth

10  disturbance be run through the Pennsylvania Department

11  of Environmental Protection, the earth disturbance,

12  which is controlled in our area by the Allegheny County

13  Conservation District.  They would have to approve any

14  earth disturbance, which means there should be silt beds

15  or some control device down slope of the property so

16  that loose material does not run off onto the neighbor's

17  property or into the waterways of the Commonwealth.

18  Q.   And to your knowledge, that has not been done on

19  this property?

20  A.   I did not see any evidence of it.

21  Q.   Let's move onto paragraph 11.

22  A.   Paragraph 11, I'm concerned with whether some of

23  this material has been used to build up the yards and

24  encroaching on the neighboring property.

25         When you look at the Allegheny County GIS

1   mapping, which inherently is not absolutely accurate, it

2   looks like some of the fill is crossed with what they

3   define as problem boundary.  So my question is we need a

4   property survey to ensure that all the material and any

5   work done is on the Lamia property.

6   Q.   Then, lastly, Paragraph 12.

7   A.   Okay.  This has to do more with the fact that this

8   is a commercial operation coming from a business.  This

9   isn't a homeowner just dumping concrete over the

10  hillside.  This was commercial materials brought onto a

11  residential property.

12  Q.   And that's a big cause for concern specifically

13  why?

14  A.   Well, No. 1, you shouldn't intermix the commercial,

15  but you got materials like this that should not be on a

16  residential property in the form they are.

17          If this were on somebody's construction yard

18  to be used for other construction purposes later, that

19  might be fine but the fact that this is unsecured and

20  can affect the public health and safety is my concern.

21  Q.   So, taking all 12 factors together in your report,

22  in your view, based upon your experience as an engineer,

23  do these issues create a substantial violation of the

24  current borough zoning and code provisions?

25  A.   They are a dangerous condition that needs to be

1    addressed.  From my personal opinion I do believe they

2    are a substantial violation but I'm not a code

3    enforcement person.

4    Q.   Do you base your opinions that were presented to

5    the Court based upon a reasonable degree of certainty as

6    a professional in your field?

7    A.   I do.

8    Q.   I want to now get to the last part of your

9    paragraph which I consider to be the remedial part of

10   your report.  If you can start describing some of those

11   provisions to the Court.

12   A.   Yes.  What I outline are a number of steps.  Again,

13   this was a year ago and the conditions that we observed

14   that need to be taken to bring this into compliance.

15           One was submit an application for a grading

16   permit because any earth disturbance out there is going

17   to require grading of some sort, removal of all this

18   material, recontouring the slope, it's going to require

19   a grading permit.

20           No. 2 is provide a grading plan for that work

21   so that everybody knows exactly what is going to be

22   performed and how it's going to be performed.

23           No. 3 was do a geotechnical investigation of

24   the contents of the placed fill to see what is buried

25   inside that hillside.  We can see brick, block, other

1   durable materials on the surface but I don't know if

2   there is buried wood and other deleterious materials in

3   the hillside.

4          No. 4, appropriate erosion sedimentation

5   control.  Like I just said, you want to have something

6   to protect the environment below the work area.

7          The fifth one, remove the trees and stumps.

8   Again, I'm concerned as they deteriorate, they are going

9   to instigate a slide.

10         The sixth one, remove any deleterious

11  material, things that really should not be there that we

12  don't know about.  If you find anything, they have to

13  take it and haul it off site to a regulated dump.

14         The seventh one, to do a property survey that

15  we talked about just so we know anything we do or redo

16  on that property is on that parcel and not on somebody

17  else's property.

18         The next to last one on the next page, large

19  concrete pieces are placed to avoid creation of voids.

20  A couple large pieces can be there but a lot of this

21  concrete needs to be simply broken up with a jackhammer

22  or a hoe ram, something that pounds on it and reduces

23  the size so you don't end up with big voids that cause

24  problems in the future.

25         Then the last one is revegetate everything.

1   There is no vegetation growing on that slope other than

2   the trees right now.  We need to get grass or some other

3   seed mixture onto that slope.

4   Q.   So I want to ask you three pretty targeted

5   questions now.

6          The first question is do all these provisions

7   of your report create a dangerous condition as it exists

8   on the property today?

9   A.   My first set of bullets 1 through 12, yes,

10  definitely.

11  Q.   Is it your opinion that all the remedial provisions

12  of your report are necessary to bring the property into

13  compliance and prevent a dangerous condition?

14  A.   Yes.  It will correct all those measures I have

15  issues with.

16  Q.   Lastly, in your experience as an engineer,

17  approximately how much would it cost to do all the

18  remedial measures that you outlined in your report?

19  A.   We don't know what's hidden from us.  Based on

20  experience, I think we're talking about an order of

21  $100,000 for the level we are talking about.

22  Q.   Now, I know I asked you to get through that as

23  efficiently as possible.  I'm sure the Court appreciates

24  that.

25          Is there anything else that you would like to

**Harold McCutcheon - Direct**

1   testify to with regard to your report before we move on

2   from that?

3   A.   No.  I think that pretty well speaks for itself.

4   Q.   In addition to your report, I would like to ask you

5   a few questions about the Google photographs that were

6   presented.

7   A.   Okay.

8   Q.   In your experience as an engineer, would the

9   elevation or the lack of a change in elevation factor

10  into any of your analyses?

11  A.   Well, I don't think these Google Earth images as I

12  heard in testimony accurately portray the elevation.

13  Q.   Why is that?

14  A.   The Google Earth program is a series of aerial

15  photographs with a digital terrain model overlaying over

16  that and you can input a location, whatever, but it

17  doesn't change -- the model doesn't change as the years

18  go back.

19           I can take and look at last year's and it will

20  have whatever the number we talked about, 1149.  I can

21  go back five years to that same location, it is going to

22  say 1149.  I can go back 20, 30, 50 years if I could,

23  well, you can't on Google Earth, and it is going to say

24  1149 because that's independent of the photograph.

25  Q.   So when you're preparing a report, would you ever

1    rely on Google Earth for really the crux and substance

2    of any issues that you may find in these scenarios?

3    A.    I look at the visual images, visual portion of it,

4    how things have changed.  If I need current data on an

5    elevation for a project, I'll look at it and use it

6    currently but nothing historically.

7                I have gone back on other projects and tried

8    to look at work that was done presently and something

9    done five years previously where I know the elevation

10   was changed by ten feet, but Google Earth doesn't

11   display that.

12   Q.    So is a more efficient way and reliable way to

13   determine if there is a dangerous condition on a

14   property to analyze photographs, for example, that you

15   put in your report at paragraph 8?

16   A.    Yes.

17   Q.    Is it also more efficient and reliable to have an

18   analysis of the photographs that were presented in court

19   this afternoon as Exhibit D?

20   A.    Yes, because you're looking at what the conditions

21   are, not relative to the elevation but the fact that

22   that dangerous condition exists right now.

23                MR. SHUBER:  Thank you.  I have no further

24   questions.

25                THE COURT:  Thank you, counsel.

Harold McCutcheon - Cross

1          Plaintiff counsel, do you have

2    cross-examination?

3          MR. KROECK:  Yes, Your Honor.

4          THE COURT:  You may cross-examine.

5               CROSS-EXAMINATION

6    BY MR. KROECK:

7    Q.   How are you today?

8    A.   Very good.

9    Q.   When were you first called out to look at the

10   property?

11   A.   May of last year.

12   Q.   Had you looked at the property before that?

13   A.   I knew where the house was because I drive by it

14   twice a day but, again, on Center New Texas Road.  I've

15   never been down McJunkin previously.

16   Q.   Have you looked at property since last year?

17   A.   Just windshield drive-by surveys every couple of

18   months to see if it changes.

19   Q.   Has it changed at all?

20   A.   Not with respect to the slope, no.

21   Q.   So the possibilities mentioned in your report, none

22   of them have come to fruition so far?

23   A.   Not to date.  Doesn't mean that they won't.

24   Q.   Okay.  Could you tell when you looked at the

25   property when those materials were placed there?

1    A.    I know it's been pretty -- not recently but I can't

2    give you a timeframe to say if it was two years ago,

3    five years ago.  You really can't tell.

4           The only thing I could see was some brickwork

5    and stuff that was referred to in the photographs didn't

6    have vegetation growing around it which means it's newer

7    but there's nothing growing around this material that

8    says it's been there forever.

9    Q.    So some of it may have been there a very long time?

10   A.    It's a possibility, doesn't mean it's not a

11   dangerous condition.

12   Q.    Right.  Absolutely.  Did you do any findings in

13   your report related to structural issues?

14   A.    No, because I am focusing on the geotechnical

15   issues.

16   Q.    Did you see anything that would have impacted the

17   structural integrity of the home?

18   A.    No, I didn't look at anything that had to do with

19   the home or distance from it.

20   Q.    Okay.  To your knowledge, occupancy typically deals

21   with a home?

22   A.    My understanding is occupancy deals with a

23   property.  The home can be fine but if it's in a

24   dangerous area, you are not going to be able to occupy

25   that home.

1  Q.   All right.  Do you know why your office wasn't

2  called when the carport was put in in 2017?

3  A.   I don't know that they weren't called.  I was not

4  involved.

5  Q.   So you don't know one way or the other?

6  A.   Correct.

7  Q.   Article No. 10 in your report, could you read it

8  for the Court, please?

9  A.   Failure to install proper erosion control elements

10  per the Pennsylvania Department of Environmental

11  Protection, Chapter 102 regulations for land disturbance

12  less than 5,000 square feet, measures must be

13  implemented but no written plan or permit is required.

14         So if I disturb less than 5,000 square feet, I

15  don't have to do a plan to the Allegheny County

16  Conservation District for documenting erosion

17  sedimentation control measures.

18  Q.   About how much square footage are we talking about

19  here?

20  A.   It's less than 5,000.  This is different than a

21  grading permit.

22  Q.   Is it considerably less than 5,000?

23  A.   Yes, probably.

24  Q.   Does your report mention the word "danger"

25  anywhere?

1    A.    I don't believe I used that word.  No, I don't

2    think I had that exact word in there.

3    Q.    So calling this a dangerous condition, that was

4    something that came up with counsel today?

5    A.    No.  This is inherently a dangerous condition.  I

6    just did not put that word in my report.

7    Q.    Isn't the only place in the report where you

8    actually call a dangerous condition the rugged rocks

9    themselves?

10    A.    That's part of the issue, yes.  They are inherently

11    dangerous.

12    Q.    But, again, you saw no structural integrity issues?

13    A.    I did not look at structure.

14    Q.    And you see no movement of this hillside?

15    A.    Not that I'm aware of at the present time, not

16    since I looked at it in the past year.

17    Q.    Are you aware if a survey was ordered in 2017 when

18    the carport was put in?

19    A.    I do not.

20            MR. KROECK:  Thank you.  I have nothing

21    further.

22            THE COURT:  Any redirect?

23            MR. SHUBER:  Just briefly, Your Honor.

24            I'm being cognizant of time, so I will be very

25    brief.

1                    REDIRECT EXAMINATION

2    BY MR. SHUBER:

3    Q.    Bud, I would like to direct your attention to

4    Paragraph 8 of your report.

5    A.    I'm there.

6    Q.    If you look at the last sentence.  I think we went

7    over it during your direct examination so I just want to

8    make sure there is a clear record of it.  You did use

9    the word "danger" in your report, correct?

10   A.    Honestly, yes.

11   Q.    And I believe you testified to the Court that in

12   your view, this did create a dangerous condition, not

13   only to the occupants but also visitors, correct?

14   A.    Correct.

15   Q.    I just want to ask you a few clarifying questions

16   with regard to structural integrity.

17          When you are hired as the borough engineer to

18   go out and perform a site inspection, do you look at the

19   whole property or just the structure?

20   A.    I look at what I am assigned to look at for that

21   particular assignment.  I have looked at structures with

22   the Borough as far as their integrity on assignment but

23   in this case, this was a slope issue, a grading permit

24   issue.

25   Q.    So as a grading permit issue, you looked at the

**Harold McCutcheon - Redirect**

1  integrity of the property as a whole, correct?

2  A.    Correct.

3  Q.    In your report or in your opinion, I should say, if

4  the integrity of the property itself is compromised,

5  that could also compromise the structures on the

6  property, correct?

7  A.    Depending on the situation.  I don't think this one

8  is close enough to do that, but there are instances

9  where it has and can affect a structure.

10              MR. SHUBER:  I don't have any further

11  questions.

12              Thank you, Your Honor.

13              THE COURT:  Any recross?

14              MR. KROECK:  No, Your Honor.

15              THE COURT:  Thank you, sir.  You may step

16  down.

17              Ms. McNulty, can you provide counsel with an

18  update on time, please?

19              THE LAW CLERK:  Plaintiff has 47 minutes.

20  Defendants have ten minutes.

21              THE COURT:  Defense counsel, do you have

22  additional witness testimony to present?

23              MR. SHUBER:  No, Your Honor.  Thank you.

24              THE COURT:  All right.  At this point is the

25  evidentiary record closed for this hearing?  Plaintiff's

 1    counsel, you don't have anything additional, correct?

 2              MR. KROECK:  Nothing.

 3              THE COURT:  Defense counsel, you don't have

 4    anything additional?

 5              MR. SHUBER:  Correct, Your Honor.  Thank you.

 6              THE COURT:  All right.  At this point if

 7    counsel would like, I will hear brief argument as to

 8    whether or not the standard for a preliminary injunction

 9    has been met in this case.

10              MR. KROECK:  Of course, Your Honor.  May I

11    proceed?

12              THE COURT:  You may.

13              MR. KROECK:  Thank you.

14              Your Honor, what we went over today hinges on

15    whether there was a substantial violation, a violation

16    of a building, housing, property maintenance or fire

17    code or maintenance, health or safety nuisance ordinance

18    that makes a building structure or part thereof unfit

19    for human habituation.

20              Occupancy deals with structures.  We just

21    heard their engineer say this condition was not close

22    enough to the structure to cause a structural issue.

23              Occupancy must issue under the MPC.  They

24    shall issue a permit or at the very least, a temporary

25    permit and it even says within the Act, unless the

1    property is unfit for human habituation, it must issue

2    temporary use of occupancy permit that allows a real

3    estate transaction to go to closing.  The MPC

4    contemplates that without occupancy, these deals don't

5    close.

6            No one has presented testimony as to how this

7    refuse got on the property or when it was on the

8    property.

9            If they have an issue with it, they can deal

10   with it through code enforcement and counsel even cited

11   in their brief, in their brief, Your Honor, they can use

12   code enforcement for the new purchaser of a home.

13           There are many ways this situation can be

14   handled and holding up zoning and holding up occupancy

15   is not one of them.  It's not proper.  That is why we

16   are here today.

17           They seem to disagree with that.  They seem to

18   feel that we appealed this grading issue.  That's not

19   why we filed the lawsuit.  That's not why we filed this

20   TRO.

21           If this sale doesn't go through, my client

22   will be harmed.  He will be harmed in an irreparable

23   manner.  We don't know that this sale or a similar sale

24   will occur again in the future.

25           The bona fide purchasers of his home are put

1    in one of the worse situations.  They are living in a

2    hotel.  My client is paying for their hotel right now so

3    that this deal can go through.

4           Moreover, money damages from the taxpayers,

5    that is not proper for taxpayers to be compensating for

6    a deal that should and shall go through under the MPC.

7           He has been irreparably harmed by this and

8    will be irreparably harmed if the second sale doesn't go

9    through.  It has been 22 months that he has been trying

10   to sell this property.  He's been trying to get

11   occupancy.  And, again, occupancy is for structures.

12          The law is very clear and that's why I did not

13   feel an evidentiary hearing was needed.  They shall

14   issue occupancy or they shall issue temporary occupancy.

15          In none of their letters, in none of their

16   correspondence was a substantial violation outlined.

17   Only today are they now trying to claim it's a

18   substantial violation even though it has precisely

19   nothing to do with the structure or occupancy of the

20   structure.

21          Thank you.

22          THE COURT:  Thank you, counsel.

23          Defense counsel.

24          MR. SHUBER:  Thank you, Your Honor.

25          The testimony that we have heard today from

1  plaintiff, one of the reasons why I may have jumped the

2  gun a little bit was that they simply don't provide the

3  Court with any evidence to meet the necessary

4  requirements for the Court to grant an injunction.

5          I think the most relevant portion of the

6  plaintiff's testimony was at the very end when he was

7  talking about his financial situation, the impact on him

8  to move back and forth, to come up here for hearings and

9  this hearing today by plane as temporary.

10          I think there is no greater evidence of that,

11  and I'm speaking about the irreparable harm provision

12  right now, Your Honor, there's no greater evidence of

13  that than the fact that when this property was listed

14  originally, it was listed for $202,000 and that sale

15  fell through.  That's part of the basis of the

16  underlying complaint.

17          Now, we have new information that is not

18  supported by a new complaint that's being attempted to

19  be conflated with the underlying issues where, in fact,

20  plaintiff received a greater offer on the home for

21  $262,000.

22          I think that the testimony presented to the

23  Court by Mr. Soboslay said very clearly in his email

24  correspondence to the plaintiff that no one at the

25  borough is trying to prevent you from selling your home.

 1   All that they are requiring is that you bring

 2   substantial violations into compliance.

 3            One of the things that was stated today -- is

 4   it okay if I approach, Your Honor?  I have the statute.

 5            THE COURT:  You may.

 6            MR. SHUBER:  If I can direct the Court's

 7   attention to Page 2, which is 68 P.S. Section 1082,

 8   substantial violation is clearly defined within the

 9   statute.

10            Substantial violation is defined as a

11   violation of an adopted building, house, property

12   maintenance or fire code or maintenance, health or

13   safety nuisance ordinance that makes a building,

14   structure or any part thereof -- I want to highlight

15   that -- or any part thereof unfit for human habituation

16   and is discovered during the course of a municipal

17   inspection of a property and disclosed to the record

18   owner or perspective purchaser of the property through

19   issuance of a municipal report.

20            I think that this issue falls squarely within

21   the definition of substantial violation.

22            There's been some argument and testimony

23   presented to try to minimize or make much of the fact, I

24   should say, that that specific word hasn't been used but

25   when you take the definition on its face, if even at the

1  very end, you want to get into the analysis of

2  structural engineering versus geographical engineering,

3  the point is and what's very clear in the statute is

4  structure or any part thereof unfit for habituation.

5          I think that Mr. McCutcheon very clearly

6  testified that when he came to take a look at the

7  property, a part thereof is unfit for human habituation.

8          This is why the Borough has consistently

9  denied the occupancy permit request.

10          This is a situation that has been at issue

11  since 2017.  Mr. Soboslay testified that correspondence

12  has been sent to Mr. Lamia repeatedly to bring his

13  property into compliance.

14          What I heard today was this isn't my stuff.

15  It was here when I got here.  It's somebody else's,

16  construction, concrete from 1998.

17          That's not good enough.  That doesn't allow

18  plaintiff to escape his responsibility from cleaning

19  this property up, and he said it on the stand.  He said

20  he hasn't done it.  He said he won't do it.

21          Now what he is trying to do is pass the buck

22  to the prospective purchasers.  Now I haven't looked at

23  the disclosure sheets and what has been exchanged but

24  this is a dangerous condition.  That has very clearly

25  been testified to.

1            I blended the two prongs and I apologize for

2    that, but I don't think he has any likelihood of success

3    on the merits.

4            I don't think he is irreparably harmed

5    because, if anything, he has received an increased offer

6    on the house and as I said in my papers, theoretically,

7    if he brings the property into compliance, he might

8    actually get a better offer.

9            There were multiple photographs shown to the

10   Court today that exist over a wide period of time that

11   show the hillside is dangerous.  That's the same picture

12   that's in the engineer's report and that's the same

13   photographs that have been consistently taken on this

14   property since at least 2017 and probably sometime

15   before that.

16           So I don't think he meets the standard for the

17   first two parts of the test.

18           I think it's very clear and the evidence shows

19   that this would be a change in status quo.  What the

20   plaintiff is asking to do is actually to make an already

21   dangerous situation even more dangerous.

22           It's an interesting point, one that I didn't

23   even think of, that the engineer brought up is Mr. Lamia

24   is gone.  He is not at the property.  If a kid comes

25   down from the neighbor's house and goes and plays on

1  these rocks, that child could also get injured.  There

2  is no one even there to make sure that something doesn't

3  happen.

4          This request to issue occupancy changes the

5  status quo.  It makes an already dangerous situation

6  even more dangerous by allowing prospective purchasers

7  to enter onto this property which by the way and has

8  been discussed before are not parties to this

9  litigation.  So any issue they may be facing with regard

10 to staying in a hotel or being out money is not at issue

11 in this case.

12         Then I would like to just point out a couple

13 of things to the Court and I'll provides in my papers.

14 I'll provide two cases that I think are relevant to the

15 issue.  The ones that I primarily cited.

16         The first case that I cited on page 5 of my

17 amended brief is the *Acierno v. New Castle County* case,

18 Third Circuit cited at 40 F3d 645, and the key cite is

19 at 653.

20         In that case, the Court analyzed the issue of

21 irreparable harm.  I have it bold and italicized in my

22 brief that -- this is the Third Circuit's opinion -- it

23 seems clear that the temporary loss of income ultimately

24 to be recovered does not usually constitute irreparable

25 harm.

1           That is squarely on point.  It's on all fours
2   with this issue.
3           All the plaintiff has alleged is that he is
4   temporarily inconvenienced.  He was temporarily
5   inconvenienced the first time and he chose not to
6   appeal.  He did not avail himself of the administrative
7   remedies and now we are back in court on a new occupancy
8   permit issue and the only thing he is saying is I can't
9   sell my house right now.  That's what Mr. Soboslay
10  testified to.
11          If he brings it into compliance, he is able to
12  sell it.  That's the only thing that is at issue.  So I
13  don't think he meets the prong for irreparable harm.
14          Lastly, on Page 6 when we talk about whether
15  this is a mandatory act or a discretionary act, this is
16  actually at issue in the underlying motion to dismiss
17  the mandamus count.  Section 1082.1, which is also in
18  the packet of the statutes that I handed to the Court,
19  is very clear that in Section 1082.1(A)(3), if the
20  municipal inspection at least reveals at least one
21  substantial violation, the municipality shall
22  specifically note those items on the inspection report
23  and shall issue a temporary access certificate.
24          So I'm not normally one to concede much but at
25  best, there is no occupancy permit that could be issued

1    by the Court.  At best, based upon the wording of the

2    statute, the issue of temporary access certificate,

3    which if you look at the definitions of the statute,

4    would simply enable the remedial process to take place.

5    It would enable people to get in there and do the work

6    which is going to be substantial.

7         I mean the engineer testified that it's going

8    to be about $100,000 to bring this property into

9    compliance.

10        So, at best, and that's the only issue that is

11   before the Court was Count 2 which was discussed at the

12   status conference, so the analysis fits within 1082.1

13   and it's very clear in the *South End Enters* case that's

14   reported at 913 Atlantic 2d. 354, with the key cite also

15   at 354.

16        This case stands for the proposition that a

17   plaintiff may never direct the exercise of discretion in

18   a particular way.  I know it's in the mandamus context,

19   but I think it fits in this analysis as well.

20        We cannot have the plaintiff ask for an

21   occupancy permit from the Borough without bringing the

22   property into compliance.

23        Essentially what he is doing here is asking

24   the Borough which has control and discretion over how to

25   enforce their ordinances so that you prevent chaos, as

1    Mr. Soboslay said.  You cannot compel the exercise of

2    discretion in a particular way, and that's what he

3    wants.

4              He wants the Borough to issue the occupancy

5    permit which at best, he could get only the access

6    certificate.  So, I don't think he meets that prong as

7    well.

8              Then in the public interest context, I think

9    it's very clear that it's critically important for

10   municipalities to be able to enforce their ordinances,

11   enforce their code provisions to prevent chaos as

12   Mr. Soboslay said.

13             If we were in a scenario where occupancy

14   permits can be granted for properties that are currently

15   in the state of a dangerous condition, it would create

16   chaos and potentially more.

17             Thank you, Your Honor.

18             THE COURT:  Thank you, counsel.

19             I appreciate counsel's presentations today.  I

20   will take this all under advisement and be ruling

21   promptly on this.

22             Thank you all.  We are adjourned.

23             (Whereupon, the above hearing was concluded.)

24                        - - -

25

I hereby certify by my original signature herein, that the foregoing is a correct transcript, to the best of my ability, from the record of proceedings in the above-entitled matter.


S/ Karen M. Earley

Karen M. Earley

Certified Realtime Reporter